FEMINIST WOMEN'S HEALTH CENTER, INC., a Florida non-profit Corporation, Plaintiff,

v.

Mahmood MOHAMMAD, M.D., et al., Defendants.

No. TCA 75–186.

United States District Court, N. D. Florida, Tallahassee Division.

June 9, 1976.

J. Lewis Hall, Jr., Hall & Booth, Tallahassee, Fla., for H. Hutson Messer.

E. Harper Field and Frank Santry, Keen, O'Kelley & Spitz, Tallahassee, Fla., for Drs. Curry, Griner & Crane.

Murray M. Wadsworth, Thompson, Wadsworth, Messer & Turner, Tallahassee, Fla., for Drs. Mohammad, Curry, Knight, Crane, Griner & Messer.

John C. Cooper, Douglass & Powell, Tallahassee, Fla., for J. Howard Griner.

Stephen Marc Slepin, Kaplan, Schwartz & Slepin, Tallahassee, Fla., for Dr. George Palmer.

Joseph J. Levin, Jr., Pamela S. Horowitz, Montgomery, Ala., Betty Owen Stinson (Lead Counsel), Stewart E. Parsons, Kent Spriggs, Tallahassee, Fla., for plaintiff.

## ORDER DENYING PRELIMINARY INJUNCTION

STAFFORD, District Judge.

This case is before the court for consideration of plaintiff's motion for preliminary injunction. An evidentiary hearing concerning the interlocutory injunctive relief sought by the plaintiff was held on May 14, 1976. Before proceeding to consider the merits of that motion for preliminary injunction it will be well to set out the court's view of the nature of this case and that evidentiary burden which falls upon each side in this litigation.

Plaintiff has brought this action under §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, alleging essentially a combination or conspiracy in the nature of a boycott. Historically, in antitrust decisions dealing with boycotts in a strictly commercial setting, pleading and proof of a combination or conspiracy in the form of a boycott has been held to constitute a *per se* violation of the Sherman Act. *United States v. General Motors Corp.*, 384 U.S. 127, 144, 86 S.Ct. 1321, 1330, 16 L.Ed.2d 415, 426 (1966); *Radiant Burners, Inc. v. Peoples Gas, Light and Coke Co.*, 364 U.S. 656, 658–60, 81 S.Ct. 365, 366–67, 5 L.Ed.2d 358, 360–61 (1961); *Klor's Inc. v. Broadway Hale Stores*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). The effect of pleading a *per se* violation of the Sherman Act historically has meant that the plaintiff need not prove that a restraint of trade was unreasonable under the circumstances or that the alleged conspiracy or combination had significant market impact or that it caused public harm, those qualities being presumed conclusively from the nature of the defendants' conduct and by the policies of the Sherman Act. *Klor's Inc.*, supra; Annot. 19 A.L.R.Fed. 586, 588–589. Moreover, evidence of the good intentions of defendants has historically been deemed irrelevant in *per se* cases. Annot. 19 A.L.R.Fed. 586, 590. However, this case presents the problem of applying these historical antitrust doctrines in the

area of a profession which is highly regulated by the state, and intimately concerns the public health and welfare. In its recent opinion of *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), the Supreme Court intimated that due deference to the state's interest in controlling and regulating the professions must be given by the federal courts in applying the antitrust laws. Therefore, in the professional context the application of historic antitrust doctrines may be somewhat different from the application of those doctrines in purely commercial settings. In other words, the professions are a special case under the antitrust regulating scheme, and the impact of state regulation and policy must be measured in any action against members of such professions.

■ The question therefore arises whether the *per se* doctrine may be applied at all in an antitrust case brought against members of the medical profession and, if so, to what extent? In the court's view, the *per se* doctrine does have application in this case, although it must be harmonized with the peculiarities of the profession involved and the dictates of state policy regarding the profession. This is true because, whatever else it may be, the medical profession constitutes in large part the rendering of a service for money and is in that sense a business. *See Goldfarb v. Virginia State Bar*, supra. Moreover, if an economic boycott is in fact carried out by members of the medical profession it is no less antithetical to free competition than is an economic boycott carried out by nonprofessionals. However, since the state has authorized members of the medical profession to organize in order to evaluate the standard of medical care and practices of the profession's constituency, see § 768.131 Florida Statutes (1975), it is the Court's opinion that, contrary to the ordinary case, good intentions on the part of the defendants here would be a defense to *per se* violation.

■ It is therefore the Court's opinion that the *per se* doctrine, although it cannot be imported whole cloth into this case, does have application here. The Court is of the opinion that the application of the doctrine in this case requires that the burden of proof be distributed as follows: Plaintiff, of course, carries the burden of proving jurisdiction under the Sherman Act. In addition, plaintiff must establish a case showing a combination or conspiracy in the nature of a boycott, and that such combination or conspiracy resulted in the interference with and damage to plaintiff's business. But plaintiff need not prove that the restraint of trade occasioned by the combination or conspiracy was unreasonable, that the conspirators had specific intent to violate the antitrust laws, nor that public harm ensued from the actions of the combination. To this extent the application of the *per se* doctrine in this case is facile. If plaintiffs establish the elements outlined above, defendants must bear the burden of proof on the "good faith" defense.

■ In the Court's view this allocation of the burden of proof best balances the policies of the antitrust laws with the public welfare burden borne by the medical profession in this state. The rationale behind the *per se* rule is thereby not devitalized by the talismatic intonement of the concept of profession. The defendant doctors are not thereby deprived of the right to assert bona fide concern for the public welfare as a defense; but if a prima facie *per se* case has been established, they must bear the burden of proof on the narrow issue of whether their action was motivated by a bona fide concern over the existence of satisfactory medical care rather than by concern over the economic impact of competition upon their medical practices. For only if they were motivated by such bona fides can their actions be deemed reasonable under the *per se* doctrine, if plaintiff has established a prima facie *per se* case. The foregoing principles have been articulated at some length because they constitute the analytical structure by which it must be judged whether plaintiff has carried its burden of proving a substantial likelihood of success on the merits.

■ Of course, to be entitled to preliminary injunction, plaintiff must not only

prove that it has a substantial likelihood of success on the merits but it must also prove a substantial threat that it will suffer irreparable harm prior to a trial on the merits being held, that the threatened harm to the plaintiff outweighs the harm injunctive relief might do to defendants and that the granting of injunctive relief would not disserve the public interest. *Canal Authority of the State of Florida v. Callaway,* 498 F.2d 567 (5 Cir. 1974).

### Plaintiff's Likelihood of Success on the Merits

■ In order to establish this element of its burden, the plaintiff must show that probable jurisdiction rests in this court under the antitrust laws, that a combination or conspiracy in the nature of a boycott was entered into by some or all of the defendants in this case, and that the result of such combination or conspiracy was interference with and damage to plaintiff's business.

■ In order to sustain its burden of proving jurisdiction the plaintiff must show that its business either directly involves interstate commerce or, if the defendant's business is wholly local in nature, that it substantially affects interstate commerce, under the *de minimis* standard. See *St. Bernard General Hospital, Inc. v. Hospital Service Association,* 510 F.2d 1121, 1125 (5 Cir. 1975). In the evidence submitted to the court there is testimony to the effect that substantial numbers of patients travel in interstate commerce in order to receive abortions from the Feminist Women's Health Center (Center), the plaintiff in this case. There is also testimony that plaintiff's officers and employees engage in substantial amounts of interstate travel in connection with the plaintiff's activities. Further, there is evidence that plaintiff handles Medicaid patients and that it has a business of some size, particularly in view of its short business life, having gross annual proceeds during 1975 in excess of $112,000. Upon the basis of the foregoing testimony, it is the Court's opinion that under prevailing jurisdictional precedent the plaintiff has adduced sufficient evidence to indicate a

strong probability of success of proving requisite jurisdiction at trial on the merits.

With regard to the existence or non-existence of a combination or conspiracy the Court makes the following findings based upon the evidence received:

1. The Center is engaged in the business of providing first trimester elective abortions in Tallahassee, Florida. Doctors Mohammad, Currie, Crane, Griner and Messer are obstetricians practicing in the Tallahassee area. Doctors Mohammad, Messer and Griner also provide first trimester abortions. Doctors Currie and Crane apparently choose not to provide abortion services on a regular basis but provide other obstetric and gynecological services in the Tallahassee community. The maximum price for a first trimester abortion obtained from the Center is $150.00. That price includes all ancillary laboratory work and followup care as well as the doctor's fee. The price for comparable services obtained from one of the defendants or other local Tallahassee physicians in their private practices is in the neighborhood of $400.00.

2. The medical community in Tallahassee is a close knit group and highly interdependent. Tallahassee Memorial Hospital (TMH) is the only hospital facility in the area. To practice successfully in this geographic area a physician must have hospital privileges at TMH. To obtain those privileges, a doctor must pass inspection, in this instance, by members of the Obstetric and Gynecological Staff (OB–GYN Staff) at TMH. The Staff, therefore, has real and profound impact upon the ability of a given physician to practice his OB–GYN specialty successfully in this community.

3. Further, in order to practice successfully an OB–GYN in Tallahassee must have the cooperation of other OB–GYN's. A doctor must be able to arrange professional amenities, such as backup or coverage for his patients when he is out of town, or otherwise unable to provide medical services to one of his patients. As one of the witnesses, Dr. Brickler, put it, "We almost literally sleep together."

4. The Center began operations in Tallahassee on June 29, 1974. From then until July of 1975 local physicians practiced at the Center apparently without difficulty or substantial controversy, although in May of 1974 the OB–GYN Staff at TMH passed a resolution to the effect that it would not approve the Center if some member of the TMH Staff was not a member of the clinic.

5. In late June of 1975 an article appeared in the local newspaper, *The Tallahassee Democrat,* featuring the Center and comparing the cost of first trimester abortions at the Center with costs if done elsewhere in Tallahassee by local OB–GYN's. It is fair to characterize this newspaper article as favorable to the Center and unfavorable to local OB–GYN's on the issue of costs for abortion services. In June of 1975 the local OB–GYN who was working at the Center (Dr. Brickler) quit. On his deposition, Dr. Brickler stated that he had experienced no trouble in his work at the Center up to the time he quit, and that he felt that during that period of time he had an amicable relationship with his fellow practitioners and had no problem getting backup or coverage for any of his patients.

6. At the July 1, 1975 meeting of the OB–GYN Staff at TMH, Doctors Crane, Messer, Mohammad and Griner were in attendance. A discussion of the Center ensued. Dr. Brickler stated that he was no longer working at the Center and that he understood that the Center was bringing in a non-local OB–GYN to perform abortions. During the discussion, Doctors Messer and Griner were active in suggesting that the situation be brought to the attention of the Capitol Medical Society, the Florida Board of Medical Examiners, and other agencies. At the hearing held in this matter on May 14, 1976, the defendants who took the stand testified that their primary concern at the time of the July, 1975 staff meeting was the issue of whether a medical doctor should associate with a clinic which advertised. The Center in fact had engaged in the practice of placing advertisements in the local and non-local newspapers making known the availability of its abortion services. The defendants who testified at the hearing also indicated some concern at the time of that meeting over the possibility that the backup or aftercare coverage being provided was inadequate if in fact abortions were being performed at the Center by non-local physicians. Dr. Brickler stated at that meeting that the "local situation" (an apparent reference to the Center) would collapse if it did not receive the support of local obstetricians. It must be noted that at the time of the July 1, 1975 meeting, the OB–GYN Staff had no direct knowledge of who was performing abortions at the Center or whether adequate aftercare was in fact available. In fact, during this period of time the Center was employing a local physician, Dr. Spurgeon McWilliams; his services ceased in August of 1975. Interestingly, Dr. McWilliams was present at the July 1, 1975 meeting, but did not come forward with information that he was employed at the Center.

7. Sometime after Dr. Brickler left the Center he was approached (apparently during July of 1975) by the Center to inquire whether he would enter into a backup agreement with the Center to provide aftercare for non-local physicians who might perform first trimester abortions at the Center. On deposition, Dr. Brickler's testimony was that he was willing to provide backup on an informal basis but would not enter into a formal agreement for fear of incurring the animosity of his fellow obstetricians whose good will is essential to his practice.

8. Sometime during the month of July, 1975 Dr. Mohammad wrote a letter to the Capitol Medical Society asking for an ethics opinion as to whether it would be ethical for a physician to incorporate for the purpose of advertising. That letter was subsequently read and discussed at a OB–GYN staff meeting.

9. At the August 5, 1975 meeting of the OB–GYN Staff of TMH Doctors Crane, Currie, Griner, Messer and Mohammad were present. Further discussion concerning the Center was had. The OB–GYN Staff voted to write to the Capitol Medical

Society stating that physicians should not be associated with the clinic so long as it advertised. This action was taken upon the motion of Dr. Crane and the second of Dr. Messer. There was discussion as to whether or not adequate abortion followup care was provided by the center.

10. On August 29, 1975 Dr. Mohammad sent a letter to Dr. Palmer, Executive Director of the Florida Board of Medical Examiners, stating that out-of-town doctors were doing office surgery at the center with no provision for continuous aftercare as required by medical standards.

11. At the September 2, 1975 meeting of the OB–GYN Staff of TMH, Doctors Crane, Currie, Griner, Messer and Mohammad were present. The Staff voted to send a letter to the resident doctors at a Jacksonville hospital who were performing abortions at the Center questioning whether there was adequate aftercare being provided for the abortions those Jacksonville residents were performing and whether those resident doctors had county occupational licenses to practice in Leon County.

12. On September 10, 1975, a letter was sent to Dr. Robert Thompson, the head of the Jacksonville residency program in which the resident doctors were enrolled. That letter stated:

"In the last monthly meeting of the OB–GYN Staff at Tallahassee Memorial Hospital, the subject of the Feminist Women's Health Clinic was brought up, and the fact that one or two of the residents from your program perform abortions without provision for possible complications and leave patients without provision for 24-hour coverage was discussed.

"For your information, the Feminist Women's Health Center has no backup for abortions performed and there is no physician in town covering aftercare complications of procedures done."

The letter went on to state the disapproval of such practice by the physicians in the local community as falling below the recognized standards of the Tallahassee medical community. This letter was signed by all the defendants in this case except Dr. Palmer and by Dr. Brickler.

13. During the summer months of 1975 one Dr. Whaley, one of the Jacksonville resident doctors who was performing abortions at the Center, was contacted by Dr. Palmer as a result of the letter sent to Dr. Palmer by Dr. Mohammad. Dr. Palmer advised Dr. Whaley that it might be in Dr. Whaley's best interest to discontinue practicing at the Center. Dr. Whaley terminated his services at the Center after the defendants wrote their letter to Dr. Thompson. Dr. Whaley testified that his main reason for quitting was because of the controversy surrounding the Center, but also because of the question of adequate backup services.

14. One Dr. Rhett, also a resident doctor in the Jacksonville hospital, worked at the Center one time during mid-September of 1975. He testified that he did not go back to the Center after the letter sent by the defendants to Dr. Thompson, because he was not told who was providing back-up service and because he felt threatened as a young physician by the controversy surrounding the Center.

15. Dr. Max Suter, director of a Jacksonville, Florida abortion clinic, called Dr. Mohammad during August of 1975 concerning the controversy over the Center. Dr. Suter knows Dr. Mohammad personally. At his deposition, taken on January 20, 1976, and filed in this court on February 6, 1976, Dr. Suter testified that, during his phone conversation with Dr. Mohammad about the Center, Dr. Mohammad stated that "his main opposition at the beginning seemed to be that they (the Center) were financially embarrassing his (Dr. Mohammad's) operation to do abortions in his office." The record before the court is devoid of any evidence contrary to this assertion. Dr. Mohammad is one of the practitioners most active in performing first trimester abortions.

16. The actions outlined above resulted in the termination of the services of Doctors Whaley and Rhett, the reluctance of local physicians to work at the clinic or to

provide backup services, and interference with the Center's ability to perform abortions and to obtain adequate aftercare services.

■ From the foregoing facts, and without weighing the bona fides of the defendants' actions, since it is their burden to establish them as affirmative defenses, the Court concludes that the plaintiff has established a prima facie violation of the Sherman Act. The Court so concludes as to all defendants except Dr. Palmer. As to him the evidence is not persuasive that he was acting other than appropriately in executing his duties as Executive Director of the Florida Board of Medical Examiners.

With respect to the other defendants, there is certainly evidence of a concerted plan or arrangement to take action which would be detrimental to the Center. The action contemplated would necessarily restrain the Center's ability to provide abortion services, since such services could not possibly be offered without the availability of physicians willing to perform the procedure and physicians willing to provide adequate aftercare services. Whatever the defendants' intentions were, the results have been to restrain trade. Further, there is ample evidence of overt acts in furtherance of the plan or agreement.

■■ At least as to Defendant Mohammad there is uncontradicted proof of anticompetitive animus in his actions. As to Doctors Currie, Crane, Griner and Messer there is no direct evidence of such animus. However, it is not necessary to prove specific intent to restrain trade where there can be no doubt that the necessary result of an act or series of acts will be to restrain competition, particularly where the acts complained of would constitute a *per se* violation of the antitrust laws. See *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948); *Arthur Murray, Inc. v. Reserve Plan, Inc.*, 406 F.2d 1138 (8 Cir. 1969). Acquiescence in a course of conduct, the necessary consequences of which would be to restrain trade, is sufficient to imply intent and to establish a conspiracy. *Interstate Circuit,*

*Inc. v. United States*, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939). Doctors Currie, Crane, Griner and Messer were aware, as stated by Dr. Brickler during the July 1, 1975 OB–GYN Staff Meeting, that the mere lack of cooperation by local obstetricians would eventually bring about the collapse of the Center. Much more so would an active campaign against the Center. Nor can there be any real doubt upon the evidence as to the proximity and degree of interference with the clinic's operations occasioned by the course of conduct adopted by the defendants. The impact was real and immediate. Local doctors were reluctant to provide services for aftercare for fear of incurring the animosity of their fellows. The Jacksonville residents felt it was necessary to dissociate from the Center to avoid a controversy with the local medical community.

■ However, to say that the plaintiff has established a prima facie case is not sufficient. In weighing the plaintiff's ultimate probability of success on the merits, the defendants' affirmative defenses must be considered.

Defendants have asserted a number of defenses which essentially boil down to three:

1. The defendants' actions are protected because they were taken in the capacity of quasi-public officers who have concern with medical standards and ethics. This is, in a shorthand fashion, known as the "Parker" defense. *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943).

2. The defendants are protected because all actions were in the nature of influencing governmental or quasi-governmental agencies with respect to the enforcement of standards of the medical profession. In a shorthand fashion, this is known as the "Noerr-Pennington" defense. *Eastern Railroad President's Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).

3. All actions were taken out of good faith concern for the public interest and for

the sole purpose of maintaining medical standards and were therefore reasonable and not calculated to restrain plaintiff. In shorthand, this can be termed a "good faith" defense.

### The Parker Defense

Parker v. Brown, supra, held that an anti-competitive market effect deriving its authority from legislative commands of state did not violate the Sherman Act because the Act was not intended to prohibit a state from imposing a restraint upon trade as an act of government, but rather was directed to private practices. Parker involved a marketing order issued under a state statute. Defendants in this case seek to make the Parker rationale applicable to their circumstances. They note the authority provided by § 768.131 Florida Statutes and analogize their position to the facts of the Parker decision. A similar argument was addressed in the Supreme Court's decision in Goldfarb, supra. The Supreme Court addressed that contention and decided the issue by the following language:

"The threshold inquiry in determining if an anticompetitive activity is state action of the type the Sherman Act was not meant to proscribe is whether the activity is required by the state acting as a sovereign." (emphasis supplied). Goldfarb, supra, at 2015.

There the holding was that fee fixing was not required and therefore the Parker defense was unavailing. In the case sub judice, § 768.131 Florida Statutes 1975 requires nothing but only authorizes the formation of hospital review committees to oversee the medical practices and standard of care being provided by members of the hospital staff. It is plain that the intent of the statute is to facilitate the maintenance of good medical practice by authorizing peer group review of the competency of medical doctors associated with a hospital or a medical association. To that end a two-fold but limited immunity is provided. But it cannot therefore be said that any of the actions taken by defendants in this case were required by the State acting as sovereign.

The defendants were not acting under the coercive effect of a state statute or a rule of a state agency having sovereign power to compel compliance with a specific mode of behavior. At most, state law in this case offers an immunity which is not applicable upon the facts of this case. It follows that the Parker defense is inapplicable, except to Dr. Palmer, upon the state of the record as it now exists.

### The Noerr-Pennington Defense

The essence of the Noerr-Pennington defense can be found in the following language from United Mine Workers v. Pennington, 381 U.S. 657, 670, 85 S.Ct. 1585, 1593, 14 L.Ed.2d 626, 636 (1965):

"Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act." (emphasis supplied).

The doctrine now extends to attempts to influence public administrative bodies. Annot. 17 A.L.R.Fed. 645, 658. The doctors in this case contend that all of their actions were directed to public or "quasi-public" agencies and are thus immunized by Noerr-Pennington regardless of the doctor's motives. As to any communications directed to the Florida Board of Medical Examiners or Dr. Palmer this is a correct defense. The Board is a public agency and defendants have a right to petition it under Noerr-Pennington regardless of motive. Of course, even though such communications are immunized under Noerr-Pennington, evidence of such communications is admissible to establish a larger overall conspiracy. See Annot. 17 A.L.R.Fed. 645, 667 (1973).

With respect to communications among members of the OB–GYN staff at TMH and communications directed to the OB–GYN staff of the Jacksonville hospital, it is the court's opinion that upon the facts of this case Noerr-Pennington does not apply. First, the case law has not extended to Noerr-Pennington to the facts of this case. Defendants argue for such an extension,

citing *Saenz v. University Interscholastic League*, 487 F.2d 1026 (5 Cir. 1973) and *Padgett v. Louisville & Jefferson County Air Bd.*, 492 F.2d 1258 (6 Cir. 1974). *Saenz* is distinguished from the instant case in that it dealt with an entity which was indisputably part of a state agency. *Padgett* does contain footnoted language characterizing the agency there involved as quasi-public. However, the facts in *Padgett* clearly distinguish the position of the defendant there from that of the defendants in this suit. In *Padgett* the Air Board was designated by statute as a unit of government and given legislative authority to act for the state as to matters over which it was given jurisdiction. Clearly such attributes of government may not be claimed by the medical review committees envisioned by § 768.131 *Florida Statutes.* The *Noerr-Pennington* doctrine is bottomed upon the First Amendment right to petition government freely. The OB–GYN staff at TMH is not a public regulatory body. The staff is as much private as it is public. The intent of § 768.131 Florida Statutes, supra, is not to create a public regulatory agency, but to authorize the formation of a private peer group review organization which, ultimately, will be salutary to the public welfare. To that end, members of such a committee are given a limited immunity in their actions by state statute. However, the concerns of unfettered exercise of the right to petition government do not apply to these peer group committees. Further, as to the actions taken by the TMH OB–GYN staff, it must be remembered that these defendants comprise the very body which they would, under their legal theory, seek to petition. Common sense dictates that the policy of *Noerr-Pennington* was not intended to stretch so far.

As to communications that the defendants may have had with the Capitol Medical Society, what has been said before is equally appropriate. This society is clearly not a governmental body, but is a private voluntary association with no state-sanctioned regulatory power. Therefore, *Noerr-Pennington* does not apply to such communications.

Thus it is the Court's opinion that the defendants have not established facts which would make the *Noerr-Pennington* doctrine a completed defense in this case.

### The Good Faith Defense

As to the good faith defense the question is whether the defendants were motivated by a bona fide concern over medical or ethical standards rather than by an anti-competitive animus. It must be remembered that the defendants bear the burden of persuasion on this defense.

The defendants who testified at the preliminary injunction hearing held in this matter on May 14, 1976, indicated that concern over the clinic's advertising practices and provision for adequate aftercare services was the motivation for their actions. However, the Court is not persuaded that the defendants carried their burden on this issue.

First, there is the uncontradicted assertion of Dr. Max Suter, a disinterested party in this litigation, that Dr. Mohammad admitted economic motivations. It would seem that this admission by Dr. Mohammad to Dr. Suter may be imputed to the other defendants, since there is sufficient independent evidence to establish a combination or agreement and the participation of the other defendants, excepting Dr. Palmer, in it. *See e. g., Overseas Motors, Inc. v. Import Motors Limited, Inc.*, 375 F.Supp. 499 (E.D.Mich.1974). Moreover, it must be remembered that the testimony received at the preliminary injunction hearing was from the defendants who, according to their interrogatory answers, are the least involved in first trimester abortion services.

Secondly, the timing and sequence of events must be considered. The record indicates that prior to the publication of the *Democrat* story in June of 1975 the Center was operating without substantial controversy and, if not with the approval of the local medical community, at least with its acquiescence. It was not until after the appearance of this newspaper article, which compared the defendant's fees for services unfavorably with the Center, that any seri-

ous objection to the advertising practices of the Center or the level of medical care provided by the Center arose.

Thirdly, concern must be directed to the question of whether the standard of good faith which the doctors must show is subjective or objective. In the Court's opinion the dictates and policies of the anti-trust laws require that the standard be an objective one. That is, the test of good faith is whether or not a reasonable man in a position of the defendants would have acted as they did under the circumstances. With this standard in mind it must be noted that the defendants here are educated men. They were aware of the profound impact that their actions could have upon the Center's viability. They also, no doubt, had some cognizance of the vast change in the legal and social status of first trimester abortions in this country during the last three years. Yet the defendants have testified that they did not seek legal advice concerning the status of abortion clinics regarding advertising nor did they inquire of any organized ethics organization or any branch of the American Medical Association or any other medical organization prior to resolving to send a letter to the Ethics Committee of the Capitol Medical Society stating unequivocally that physicians in the Medical Society should not be associated with such a clinic if it advertises.

There was much testimony concerning the appropriate standards for aftercare coverage for first trimester abortions. That testimony resolves down to the fact that there is considerable difference of professional opinion within the medical community as to the meaning, interpretation and coercive effect of medical standards relied upon by the doctors who are defendants here. In short, it is not all that clear on the state of the record thus far developed that a violation of medical standards occurs where an abortion facility performing first trimester abortions arranges for backup services instead of the doctors actually performing the abortions making such arrangements. Against the background of uncertainty surrounding those standards,

the defendants here undertook no thoroughgoing inquiry to determine whether in fact aftercare was being provided by the Center and the nature of the aftercare before writing letters to both Dr. Thompson and the Florida Board of Medical Examiners stating categorically that no continuous aftercare was being provided by the Center. Further, the atmosphere under which the defendants did make limited inquiries was apparently not dispassionate.

In short, weighing the defendants' testimony concerning their bona fides against the evidence in favor of plaintiff's case, conflicting inferences can be drawn. However, the burden is upon the defendants to establish their bona fides. Due to the circumstances of their actions, the timing, the precipitous nature of those actions, and the broad scale of the actions undertaken without thorough investigation, the Court feels that the evidence of the defendants' bona fides is at best evenly balanced. No doubt, as the tenor of some of the depositions indicates, a good amount of the antipathy within the medical community towards the Center was generated by the Center's confrontation tactics and attitudes. But, the evidence adduced thus far on the whole preponderates toward the inference that the mainspring of the defendants' actions was economic. Therefore, the Court is of the opinion that plaintiff has carried its burden of establishing a substantial likelihood of success on the merits of this case.

### Likelihood of Irreparable Harm to Plaintiff

In the Court's opinion this element in the plaintiff's burden is the weak link in its case for preliminary injunction. There was no evidence adduced, apart from the conclusory testimony of plaintiff's director, Linda Curtis, that any injury incapable of rectification by damages will occur to the plaintiff before the time when this case will be heard at trial on the merits. It is true that there was testimony that the plaintiff's administrative problems have been multiplied, that plaintiff has had difficulty in procuring the services of doctors to per-

form abortions and to provide backup services, and that life has in general been made difficult for the Center. However, the Center has continued to function to date and there is no evidence going to any specific harm to the plaintiff which has occurred or may occur which would not be compensable by monetary damages. Moreover, the possibility of harm to the Center may be minimized by the setting of this case for trial as expeditiously as possible.

### Harm to the Defendants and the Public Interest

These two elements merge, since the only real harm which could be visited upon the defendants by the issuance of injunctive relief would be that in some manner the injunction would prevent them from effectively upholding medical standards in this community. However, effective relief in the form of a negative injunction could be fashioned which would in no way interfere with the right of the defendants to bring to the attention of appropriate medical authorities bona fide complaints concerning medical ethics and practices of obstetricians in the Tallahassee area.

Therefore, these two elements of the plaintiff's burden present no real problem. To reiterate, the weak link in plaintiff's case is its inability to show irreparable harm before this case can be tried on the merits.

Accordingly, it is ORDERED:

1. Plaintiff's motion for preliminary injunction is denied.

2. All discovery in this case shall be terminated on or before July 2, 1976.

3. The attorneys are to meet and confer for the purpose of producing a pre-trial stipulation on or before July 12, 1976.

4. Pre-trial stipulation is due to be filed in this court on or before July 22, 1976.

5. Pre-trial conference will be held in this case at 1:30 p. m. on August 2, 1976. Trial in this case will commence on August 30, 1976.