**James Jefferson McLAIN et al.,**
**Plaintiffs-Appellants,**

v.

**REAL ESTATE BOARD OF NEW ORLEANS, INC., et al.,**
**Defendants-Appellees.**

No. 77–2423.

United States Court of Appeals,
Fifth Circuit.

Nov. 15, 1978.
Rehearing Denied Dec. 15, 1978.

John P. Nelson, Jr., Richard G. Vinet, New Orleans, La., for plaintiffs-appellants.

Moise W. Dennery, J. William Vaudry, Jr., New Orleans, La., David A. Donohoe, Edward F. Schiff, Washington, D. C., for Latter and Blum.

Roy L. Price, Metairie, La., Cynthia Samuel, Tulane University School of Law, New Orleans, La., for Sandra, Inc.

Arthur L. Ballin, Frank C. Dudenhefer, New Orleans, La., Harry McCall, Jr., Robert S. Rooth, New Orleans, La., for Real Estate Bd. of New Orleans.

Edward F. Wegmann, F. P. Westenberger, New Orleans, La., for Waguespack, Pratt, Inc.

Harry S. Redmon, Jr., Rutledge Clement, Jr., New Orleans, La., for Gertrude Gardner, Inc.

Charles F. Barbera, Metairie, La., for Stan Weber.

Before GEWIN, GODBOLD and MORGAN, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

This is an alleged class action brought on behalf of buyers and sellers of residential property in the New Orleans area. Claiming that the defendant realty associations and realtors have conspired to fix the prices

of their services, the plaintiffs seek declaratory and injunctive relief as well as the recovery of treble damages. In proceedings below, the defendants filed a motion to dismiss [1] asserting that the challenged brokerage activities were wholly intrastate in nature and thus fell beyond the reach of federal antitrust prohibitions. Initially, the district court withheld ruling on this motion and prescribed further discovery limited to the question of whether the facts of this case could be brought within *Goldfarb v. Virginia State Bar,* 421 U.S. 733, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1974). After further discovery, the court concluded that the brokerage activity at issue neither occurs in nor substantially affects interstate commerce; accordingly, the defendants' motion to dismiss was granted. On appeal, a multi-faceted challenge is raised against the lower court dismissal. Examining the various contentions in light of the particular averments of the pleadings, we agree with the lower court.

Our starting point is the recognition that jurisdiction under the Sherman Act extends to the furthest reaches of congressional power to regulate commerce. *United States v. South-Eastern Underwriters Ass'n,* 322 U.S. 533, 558–559, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944). The constitutional boundaries of congressional power vary according to the nature of the activity and regulatory scheme at issue. "There is no single concept of interstate commerce which can be applied to every federal statute regulating commerce." *McLeod v. Threlkeld,* 319 U.S. 491, 495, 63 S.Ct. 1248, 1250, 87 L.Ed. 1538 (1943). Under the Sherman Act, this vast, intractable expanse of federal jurisdiction is defined through a dual analysis. Jurisdiction is conferred if the acts complained of occur in the flow of commerce, or if these acts, though local in nature, substantially affect interstate commerce. *Battle v. Liberty Nat'l Life Ins. Co.,* 493 F.2d 39, 395 (5th Cir. 1974), cert. denied, 419 U.S. 1110, 95 S.Ct. 784, 42 L.Ed.2d 807 (1975); *Las Vegas Merchant Plumbers Ass'n v. United States,* 210 F.2d 732, 739 n. 3 (9th Cir.), *cert. denied,* 348 U.S. 817, 75 S.Ct. 29, 99 L.Ed. 645 (1954). With the "in commerce" test, the impact on interstate commerce is judged according to a qualitative standard—even insubstantial activity placed directly in the flow of commerce satisfies the jurisdictional requisite. *Radiant Burners, Inc. v. Peoples Gas, Light & Coke Co.,* 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961). The "effect on commerce" test, however, requires a quantitative analysis of the substantiality of the impact on interstate commerce. *Mandeville Island Farms v. United States,* 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328 (1948). Thus, activity imposing merely an "incidental" or "insubstantial" effect on commerce may fall beyond federal power. *Apex Hosiery Co. v. Leader,* 310 U.S. 469, 510, 60 S.Ct. 982, 84 L.Ed. 1311 (1940).

In the present case, the appellants argue that in today's world, real estate brokerage activities meet both tests of jurisdiction. We emphasize, though, that with both the "in commerce" and "effect on commerce" tests, we do not consider all of the ramifications that real estate sales have on nation-wide commerce. Instead, we must

---

1. This case was brought under the Sherman Anti-Trust Act (15 U.S.C. §§ 1 et seq.). The precise motion before the court was styled a Rule 12(b)(6) motion to dismiss for failure to state a claim which was treated as a summary judgment to the extent matters outside the pleadings were considered. See Rule 12(b), F.R.Civ.Pro. The court also stated that its ruling might be viewed as a dismissal for lack of subject matter. As we discuss *infra,* the better practice is to cast as jurisdictional any dismissals based upon a failure to establish the requisite commerce clause relationship to the challenged activity. Thus, we view the proceedings below as what the Third Circuit might call a 12(b)(1) "factual attack." *Mortensen v. First Federal Sav. & Loan Ass'n,* 549 F.2d 884, 890–891 (3d Cir. 1977). Such an evaluation challenges more than the sufficiency of the allegations; it questions the existence of the underlying jurisdictional facts. "In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Moreover, the plaintiff will have the burden of proof that jurisdiction does in fact exist." *Id.* at 891. *See also McNutt v. General Motors Accept. Corp.,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1935).

focus on the impact of the particular activities challenged in the appellants' complaint. The test is not that "the acts complained of affect a business engaged in interstate commerce, but that the conduct complained of affects the interstate commerce of such business." *Page v. Work*, 290 F.2d 323, 330 (9th Cir.), *cert. denied*, 368 U.S. 875, 82 S.Ct. 121, 7 L.Ed.2d 76 (1961). Examining the specific acts complained of in this case, we hold that they fail to establish jurisdiction under the "in commerce" test. The complaint alleges price-fixing of fees for the defendants' services in connection with sales of residential real estate in the New Orleans area. Such activity is entirely local in character. Real property is itself the quintessential local product. Further, the only sales activity mentioned in the pleadings occurs wholly intrastate. In such circumstances lower courts have consistently held that real estate brokerage does not fall within the flow of interstate commerce. *Marston v. Ann Arbor Property Mgt. Ass'n*, 302 F.Supp. 1276, 1279–80 (E.D.Mich.1969), *aff'd*, 422 F.2d 836 (6th Cir. 1970); *Cotillion Club, Inc. v. Detroit Real Estate Bd.*, 303 F.Supp. 850 (E.D.Mich.1964). Moreover, a Supreme Court decision considering real estate activities in Washington, D. C. noted, "(t)he fact that no interstate commerce is involved is not a barrier to this suit." *United States v. National Ass'n of Real Estate Bds.*, 339 U.S. 485, 488, 70 S.Ct. 711, 714, 94 L.Ed. 1007 (1950). Within our circuit is the view that this dictum supports concluding that real estate brokers do not operate within the flow of commerce. *Hill v. Art Rice Realty Co.*, 66 F.R.D. 449, 454 (N.D. Ala.1974), *aff'd*, 511 F.2d 1400 (5th Cir. 1975). In denying jurisdiction under the "in commerce" test, we emphasize the limited scope of our holding. Here we are not considering pleadings that allege price fixing in appreciable sales of realty to out-of-state buyers. That might be a different matter.[2] Instead, this complaint asserts only that some individuals victimized by the defendants are persons moving in and out of the New Orleans area, "[t]he cases uniformly hold that the mere movement of individuals from one state to another in order to utilize particular services does not transfer those services into interstate services within the meaning of the Sherman Act." (cites omitted). *Diversified Brokerage Services, Inc. v. Greater Des Moines Bd. of Realtors*, 521 F.2d 1343, 1346 (8th Cir. 1975).

The more compelling jurisdictional argument advanced by the appellants is their contention that the controverted brokerage activities substantially affect interstate commerce. This question has spawned a significant conflict of authority. Cases finding an interstate commerce nexus include *United States v. Atlanta Real Estate Bd.* 1972 Trade Reg.Rep. ¶ 73, 825 (N.D.Ga.1971); *Knowles v. Tuscaloosa Bd. of Relators*, No. 75–P–591 (N.D.Ala.) (unreported); *Wiles v. Tampa Bd. of Realty, Inc.*, No. 74–136 Cir. T–K (M.D.Fla.) (unreported); *United States v. Jack Foley Realty, Inc.*, (1977) Trade Reg.Rep. (D.Md.1977); *Gateway Assoc. Inc. v. Essex-Costello, Inc.*, 380 F.Supp. 1089, 1094 (N.D.Ill.1974); *Mazur v. Behrens*, (1974–1) Trade Reg.Rep. ¶ 75,070 (N.D.Ill.1972).[3] Among the decisions rejecting the sufficiency of the interstate commerce element are *Manion v. Jefferson Bd. of Realtors*, No. 73–2604 (E.D. La.1974), *aff'd*, No. 74–1901 (5th Cir. 1975); *Income Realty & Mortgage, Inc. v. Denver Bd. of Realtors*, No. 77–2051, 578 F.2d 1326

---

2. Some courts have held sufficient allegations that the defendants advertised in interstate newspapers and that they sold realty to a substantial number of purchasers situated out-of-state. *See, e. g., United States v. Jack Foley Realty, Inc.*, 1977 Trade Reg.Rep. ¶ 61, 678, at 72, 790 (D.Md.1977). We suggest no view as to whether the addition of allegations like these would bring the defendants within the bounds of the Sherman Act.

3. *See also Sapp v. Jacobs*, 408 F.Supp. 119 (S.D.Ill.), rev'd, 547 F.2d 1170 (7th Cir. 1977); *Oglesby & Barclift, Inc. v. Metro MLS, Inc.*, CCH Trade Cases ¶ 61, 064 (E.D.Va.1976); *United States v. Metro MLS, Inc.*, CCH Trade Cases, ¶ 75, 311 (E.D.Va.1973). The appellants also cite various consent decrees involving real estate brokerage activities and the Sherman Act. E. g., *United States v. Long Island Bd. of Realtors, Inc.*, CCH Trade Cases, ¶ 74, 068 (E.D.N.Y.1972).

(10th Cir. 1978) (opinion emphasized no *per se* restraint involved); *Bryan v. Stillwater Bd. of Realtors*, No. 77–1111, 578 F.2d 1319 (10th Cir. 1977); *Marston v. Ann Arbor Property Mgt. Ass'n*, 302 F.Supp. 1276 (E.D. Mich.1969), *aff'd*, 422 F.2d 836 (6th Cir. 1970); *Cotillion Club, Inc. v. Detroit Real Estate Bd.*, 303 F.Supp. 850 (E.D.Mich. 1964). *Cf. Hill v. Art Rice Realty*, 66 F.R.D. 449, 511 (N.D.Ala.1974), *aff'd* 511 F.2d 1400 (5th Cir. 1975) (defendants' position had strong support). These diverse conclusions result in part from the varying factual gradations alleged. Instead of claiming to neatly reconcile these decisions though, we return to our polestar for analysis—the specific allegations of the complaint in this case. One paragraph says that many of the defendants' customers are "persons moving into and out of the Greater New Orleans area." For the same reason that such movement does not thrust intrastate activity "in commerce," courts have held that the passage of people across state lines to procure services does not mean that those services have a substantial effect on interstate commerce. *E. g., Cotillion Club, Inc. v. Detroit Real Estate Bd., supra.*[4]

The second and primary averment is that the defendants participate in securing home financing and title insurance "obtained from sources outside the State of Louisiana." Armed principally with this allegation, the appellants advance three arguments to overcome the district court's dis-

missal of their action. First, they contend that allegations of *per se* violations, such as price fixing, give rise to a presumption of a substantial effect on commerce. Next, appellants argue that even without the benefit of this presumption, the facts and allegations of the present case are controlled by the Supreme Court's decision in *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975). Finally, they urge that even if presently established facts are insufficient, they are entitled to a trial on the merits to more fully explore their jurisdictional allegations. With all three contentions, we must disagree.

■ Initially, we reject the argument that an allegation of a *per se* violation creates presumptive federal jurisdiction. As the lower court correctly observed, the *per se* rule bears solely on the merits of a claim by conclusively establishing the unreasonableness of a particular restraint. This principle does not eliminate the need for a jurisdictional determination of whether a restraint sufficiently impacts on commerce that is interstate. Supreme Court decisions have never said that a *per se* allegation reduces jurisdictional requisites. On the contrary, the Court has analyzed jurisdiction without differentiating between *per se* and rule of reason allegations. *Compare Goldfarb v. Virginia State Bar*, 421 U.S. 773, 783–785, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975) *with United States v. Women's Sportswear Mfg. Ass'n*, 336 U.S. 460, 464, 69 S.Ct. 714, 93 L.Ed. 805 (1949).[5]

---

4. The interstate travel of customers is generally viewed as generating only "remote" or "incidental" consequences to interstate commerce; this movement of people evidently does not itself constitute a substantial source of interstate commerce. *Lieberthal v. North Country Lanes, Inc.*, 332 F.2d 269, 271–272 (2d Cir. 1964).

5. The genesis of the appellants' argument of presumptive jurisdiction probably lies in the theory's advocacy by Professor Areeda. *See* P. Areeda, Antitrust Analysis 122 (2d ed. 1974). Citing Professor Areeda, the Seventh Circuit enunciated a far reduced jurisdictional threshold for *per se* cases in an alternative holding in *United States v. Finis P. Ernest, Inc.*, 509 F.2d 1256, 1260 (7th Cir.), cert. denied sub nom. *Modern Asphalt Paving & Const. Co. v. United*

States, 423 U.S. 874, 96 S.Ct. 142, 46 L.Ed.2d 105 (1975); cert. denied, 423 U.S. 893, 96 S.Ct. 191, 46 L.Ed.2d 124 (1975) (separate appeals). Nonetheless, the opinion in *Finis P. Ernest* did require some interstate commerce, although the remodelled threshold was not clearly explicated. *See also Income Realty & Mortgage, Inc. v. Denver Bd. of Realtors*, No. 77–2051, 578 F.2d 1326 (10 Cir. 1978) (Logan, J., concurring in part, dissenting in part). *But see Las Vegas Merchant Plumbers Ass'n v. United States*, 210 F.2d 732 (9th Cir. 1954). "[W]hen the 'affect' on commerce theory is presented, it is clearly a question of fact whether wholly intrastate activities affect interstate commerce in a manner proscribed by the Sherman Act. After this question is decided, then the per se doctrine may well apply." *Id.* at 748.

In asserting that *per se* cases carry built-in jurisdiction, the appellants point to the seemingly abbreviated commerce clause analysis in *Burke v. Ford*, 389 U.S. 320, 88 S.Ct. 443, 19 L.Ed.2d 554 (1967). The facts of that case, however, do not suggest a *per se* short-cut through jurisdiction. Instead, the opinion follows a jurisdictional methodology reflected in such Supreme Court decisions as *Goldfarb v. Virginia State Bar, supra; United States v. Women's Sportswear Mfg. Ass'n*, 336 U.S. 460, 69 S.Ct. 714, 93 L.Ed. 805 (1949); *Mandeville Island Farms v. American Crystal Sugar Co.*, 344 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328 (1948); *United States v. Yellow Cab Co.*, 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947).[6] These opinions have not relied upon data showing a demonstrable and deleterious impact upon interstate commerce. Rather, the analysis entails an identification of a substantial quantity of interstate commerce and then a determination of whether the allegedly restrained activity plays a "necessary" or "integral" role in that substantial commerce. For example, in *Burke v. Ford*, the controverted interstate commerce was liquor. Because every bottle of liquor sold in Oklahoma was manufactured out-of-state, both the substantiality and the inter-state character of this commerce was manifest. The next step in the analysis is to connect this substantial interstate commerce to the alleged restraints. The plaintiffs in *Burke v. Ford* asserted that the liquor wholesalers in Oklahoma had conspired to effect horizontal territorial divisions. Because the entire liquor traffic was distributed through the wholesaler defendants, the alleged restraint operated in an activity that was clearly a "necessary" and "integral" part of interstate commerce. Thus, *Burke v. Ford* comports with a firmly entrenched mechanism for jurisdictional analysis and in no way imparts a reduced threshold for *per se* cases.

Rejecting the contention that *per se* allegations provide automatic jurisdiction, we turn to appellants' claim that this case is controlled by *Goldfarb v. Virginia State Bar, supra.* Underlying the Supreme Court's determination of jurisdiction in *Goldfarb* was the two-fold analysis that identifies substantial interstate commerce, then ascertains whether the allegedly restrained activity is "integral" or "necessary" to that commerce. In *Goldfarb*, the commerce was the interstate business of title insurance and home financing. The

---

Compounding our conviction that the Supreme Court does not differentiate *per se* cases are two other concerns. As a matter of analysis, we perceive no jurisdictional basis for distinguishing *per se* and rule of reason allegations. In neither case can one presume that anticompetitive activity is underway. For example, the claim of a conspiracy, the central underpinning of a price-fix, may evaporate before hard evidence adduced at trial. Conversely, in both cases, if sufficiently stated allegations are proven, the disruption of free market forces will be established. Whether that disruption is effected by price fixing or unreasonable vertical territorial restraints, the ultimate consequences on the market are similar: supply will be constricted and prices artificially inflated. Thus the final impacts of restraints of trade would be inseparable in their ultimate effect on commerce.

Our second difficulty with a presumptive jurisdiction for *per se* cases is a practical one. To say the least, it can be difficult to ascertain whether particular allegations are classified under *per se* or rule of reason restraints. *See White Motor Co. v. United States*, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963) (vertical restrictions not *per se*); *but see United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967) (vertical restraints are *per se*); *but see again Continental T. V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977) (vertical restraints are not *per se*). The often elusive boundary separating the substantive analyses of *per se* and rule of reason restraints does not command a drastic jurisdictional differentiation.

6. In *United States v. Women's Sportswear Ass'n*, supra, the defendant stitching contractors were integral participants in the substantial interstate commerce in which 80% of the cloth was shipped in from out-of-state followed by 80% of the finished sportswear being marketed out of state. Similarly, in *Mandeville Island Farms, Inc. v. American Crystal Sugar Co.*, supra, the defendant sugar refiners were a necessary component of the interstate commerce drawing sugar beet plants from California fields and leading to their ultimate sale as finished products in nation-wide markets. Elsewhere in this opinion, we briefly discuss the facts of *Goldfarb* and *Yellow Cab Co.*

record shows that millions of out-of-state dollars flowed into Virginia as a consequence of these transactions; accordingly, the substantiality of this commerce was beyond question. The activity charged in *Goldfarb* was price-fixing by attorneys of their fees for title examinations. To connect the alleged restraint to the interstate commerce, the Supreme Court affirmed detailed district court findings which established

> (i)n financing realty purchases lenders require, 'as a condition of making the loan, that the title to the property involved be examined . . . . Thus a title examination is an integral part of an interstate transaction . . . .'

421 U.S. at 784, 95 S.Ct. at 2011, *quoting* 355 F.Supp. at 494. By statute, title examinations could be performed only by attorneys. Therefore, the alleged price-fixing of fees for this service operated on an activity that was "integral" to interstate transactions of home financing and title insurance:

> Given the substantial volume of commerce involved, and the *inseparability* of this particular legal service from the *interstate aspects* of real estate transactions, we conclude that interstate commerce has been sufficiently affected.

421 U.S. at 785, 95 S.Ct. at 2012 (emphasis added, cites omitted).

█ The lower court in the present case distinguished *Goldfarb* by finding that real estate brokerage constituted an incidental rather than integral part of the interstate commerce of title insurance and realty financing. Through ample discovery, the lower court heard essentially uncontradicted evidence that the brokerage function terminates when a home buyer and seller are brought together. This activity does not extend to the procurement of financing or title insurance. With respect to these latter transactions, the district court found that brokers occupy no more than an incidental, informational role. Therefore, unlike the attorneys in *Goldfarb* whose participation in title insurance was statutorily

mandated, real estate brokers are neither necessary nor integral participants in the "interstate aspects" of realty financing and insurance.

This dichotomy between incidental and integral functions is based upon *United States v. Yellow Cab Co.*, 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947).[7] In *Yellow Cab*, the Supreme Court considered the relation of interstate commerce to two different cab operations. One service operated exclusively between rail terminals in Chicago carrying people from one station to the next to continue their interstate journeys. This taxi activity, and the trade restraint acting upon it, were held to be within the reach of the Sherman Act. A second cab service at issue was the general transportation of people within the Chicago area. Although this latter service frequently encompassed the movement of people to and from train stations, often to commence journeys out-of-state, the Supreme Court held that the general operation of cabs did not sufficiently implicate interstate commerce. "[W]hen local taxicabs merely convey interstate train passengers between their homes and the railroad station in the normal course of their independent local service, that service is not an integral part of interstate transportation." 332 U.S. at 233, 67 S.Ct. at 1568. "In short, their relationship to interstate transit is only casual and incidental." *Id.* at 231, 67 S.Ct. at 1567. The distinction *Yellow Cab* draws between integral and incidental activities corresponds to the distinction between *Goldfarb* and the present case. Like the first cab operators in *Yellow Cab*, the attorneys in *Goldfarb* were invariable and indispensable components of interstate commerce. And, as with the second cab activity in *Yellow Cab*, real estate brokerage does not inherently comprehend the interstate aspects of their business. "To the taxicab driver" or the real estate broker, "it is just another local fare." *Id.* at 232, 67 S.Ct. at 1567.

█ We endorse the lower court's conclusion that *Goldfarb* does not govern this

---

7. The enduring vitality of *Yellow Cab* has been reaffirmed in subsequent Supreme Court decisions, including *Goldfarb*, 421 U.S. at 784, n. 13, 95 S. Ct. 2004.

case. The factual determinations underlying the holding that real estate brokerage does not substantially affect interstate commerce must be upheld unless clearly erroneous. *United States v. Oregon Medical Society*, 343 U.S. 326, 338–339, 72 S.Ct. 690, 96 L.Ed. 978 (1952). Thus, our posture contrasts with *Goldfarb* in which the Supreme Court reviewed factual determinations in support of an "integral" role for attorneys.[8] In the present case, we find substantial evidence that real estate brokers occupy no more than an "incidental" role in interstate commerce. Therefore, jurisdiction is not established through analysis of *Goldfarb*.

■ Rejecting the appellants' theories of *per se* jurisdiction and *Goldfarb*, we come to their claim that they are entitled to a trial on the merits to more fully develop their jurisdictional assertions. For many courts, the dazzling complexity of antitrust litigation rarely commends dismissal in advance of trial. *See, e. g., Cherney Disposal Co. v. Chicago & Suburban Refuse Disposal Ass'n*, 484 F.2d 751, 759 (7th Cir. 1973), *cert. denied*, 414 U.S. 1131, 94 S.Ct. 870, 38 L.Ed.2d 755 (1974). *See also Mortensen v. First Federal Sav. & Loan Ass'n*, 549 F.2d 884, 892–897 (3d Cir. 1977). Competing against this concern, however, is the reality that antitrust suits frequently entail enormous expense. Win, lose, or draw regarding the final outcome, the very fact of trial may result in crushing costs and hardships to the defendant. To balance both sides of the antitrust equation, this court authorizes pre-trial dismissal except "where the factual and jurisdictional issues are completely intermeshed . . ." *McBeath v. Inter-American Citizens for Decency Committee*, 374 F.2d 359, 363 (5th Cir.), *cert. denied*, 389 U.S. 896, 88 S.Ct. 216, 19 L.Ed.2d 214 (1967). If jurisdiction and the merits are inextricably bound, "the jurisdictional issues should be referred to the merits, for it is impossible to decide one without the other." *Id.* See also *Battle v. Liberty National Life Ins. Co.*, 493 F.2d 39, 47 (5th Cir. 1974), *cert. denied*, 419 U.S. 1110, 95 S.Ct. 784, 42 L.Ed.2d 807 (1975).[9]

■ Applying this standard to the present case, we hold that pre-trial dismissal was proper. Here, the issues of jurisdiction could be readily separated from the merits. The substantiality of particular interstate commerce and the nature of the defendants' role in such commerce comprise one issue. A separate analytic concept is raised by the question of whether these defendants conspired to fix the price for their services. Confronting the discrete issue of the commerce nexus, the district court allowed the appellants months of discovery to develop their *Goldfarb* analogy, which was practically the sole jurisdictional argument proffered. The other interstate commerce theory to be derived from the pleadings, the movement of out-of-state home buyers into the New Orleans area, was correctly discarded as a matter of law. We therefore hold that it was not "impossible to decide the one without the other." In fact, the jurisdictional issue could be and was extricated from the merits, thoroughly aired in advance of trial, and correctly resolved by the district court. *Compare McBeath v. Inter-American Citizens for Decency Committee, supra, with Rosemound Sand & Gravel v. Lambert Sand & Gravel*, 469 F.2d 416 (5th Cir. 1972). Accordingly, we hold that pre-trial dismissal was warranted in this case.

---

8. This vital distinction is further illustrated in another antitrust context where, on analagous facts, two Supreme Court decisions diverged according to the trial court resolution of factual questions. *Compare Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939) *with Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.*, 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273 (1954).

9. Technically speaking, the merits and jurisdiction could never be severed because interstate commerce is an element of both. The teaching of *Rosemound Sand & Gravel, infra*, however, is that if the issues necessarily determinative of jurisdiction can be isolated and explored through discovery, dismissal in advance of trial may be appropriate. The effective use of discovery is a crucial feature of this case. The Supreme Court has instructed that "dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hospital Bldg. Co. v. Trustees Rex Hospital*, 425 U.S. 738, 746–747, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338 (1976).

With our endorsement of the district court's determination that this particular real estate activity neither occurs in nor substantially affects interstate commerce, we must ascertain the character of the adjudication to be rendered. The district court styled its judgment as a 12(b)(6) dismissal for failure to state a claim which was treated as a summary judgment insofar as matters outside of the pleadings were considered. Additionally, though, the court said that "the motion might properly be viewed as one for dismissal for lack of subject matter jurisdiction. We hold that this latter characterization reflects the proper disposition of this case. Because the sufficiency of the commerce nexus is both a substantive element and a jurisdictional requisite for an antitrust action, there are diverse if not disparate viewpoints on the proper procedural vehicle for resolving dismissal motions. See generally Mortensen v. First Federal Sav. & Loan Ass'n, 549 F.2d 884, 890–897 (3d Cir. 1977). And yet, whether the vehicle is a 12(b)(6) motion on the merits or a 12(b)(1) jurisdictional attack, the analysis of interstate commerce is the same. Hospital Bldg. Co. v. Rex Hospital Trustees, 425 U.S. 738, 742 n. 1, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976). In Rex Hospital, the court utilized Rule 12(b)(6) to hold that particular allegations adequately asserted the necessary commerce nexus. In such a case, the merits are properly reached because, with the substantive law determination that interstate commerce is sufficiently implicated, the adequacy of the jurisdictional predicate is also established. A markedly different situation arises, however, in the present case as we hold that the necessary relationship to commerce is missing. Although this conclusion might be viewed as a summary dismissal on the merits of appellants' claim, it also means that we lack subject matter jurisdiction of this action. This latter determination that jurisdiction is wanting must displace any con-

clusion as to the sufficiency of the appellants' claim because, where there is no jurisdiction, we do not reach the merits. E. g., Mitchell v. Maurer, 293 U.S. 237, 244, 55 S.Ct. 162, 79 L.Ed. 338 (1934). "It must be fundamental that if a court is without jurisdiction of the subject matter it is without power to adjudicate and the case could be properly disposed of only by dismissal of the complaint for lack of jurisdiction." Stewart v. United States, 199 F.2d 517, 519 (7th Cir. 1952). Accordingly, we hold that the proper disposition of this action requires a dismissal for lack of jurisdiction. Cf. Rosemound Sand & Gravel v. Lambert Sand & Gravel, supra.

In conclusion, we speak to the appellants' argument that the full realization of congressional policies mandates expansive judicial construction of the commerce clause. As the appellants observe, the acceptance of commerce clause limitations is an acknowledgment that the federal government is powerless to remedy alleged wrongs. Juxtaposed against this acknowledgment, however, is the growing spirit of federalism manifested at all levels of judicial and legislative decisionmaking.[10] This momentum is fueled by the realization that state processes are available to combat the full gamut of wrong doing, often including alleged restraints of trade.

Even in the absence of state remedy, federal power cannot be extended simply because some wrong might otherwise be uncorrected. It is axiomatic that legislative laws and policies cannot bend principles of constitutional dimensions. Thus, no matter how beneficial, the Sherman Act cannot be thrust past its commerce clause anchorage into the residual expanse of state and individual prerogative. Such a limitation of federal authority, whether requiring the dismissal of an antitrust suit or the freeing of a criminal defendant, is a necessary con-

---

**10.** "[A] state is not merely a factor in the 'shifting economic arrangements' of the private sector of the economy . . . (cite omitted) but is itself a coordinate element in the system established by the Framers for governing our Federal Union." National League of Cities v.

Usery, 426 U.S. 833, 849, 96 S.Ct. 2465, 2473, 49 L.Ed.2d 245 (1976). A similar conviction is expressed in the Revenue Sharing Act, 31 U.S.C. § 1221 et seq. See, e. g., S.Rep. No. 92–1050, 92 Cong., 2d Sess., pt. 8 (1972), 1972 U.S.Code Cong. & Admin.News at 3874, 3939.

comitant of private freedoms. With this acceptance of the limits of judicial power, we hold that there is no jurisdiction to consider this action and therefore order the case

DISMISSED.