**FEMINIST WOMEN'S HEALTH CENTER, INC., a Florida non-profit Corporation, Plaintiff-Appellant Cross-Appellee,**

v.

**Mahmood MOHAMMAD, M. D., et al., Defendants-Appellees Cross-Appellants.**

No. 77–1924.

United States Court of Appeals, Fifth Circuit.

Dec. 20, 1978.

---

1. We also affirmed the District Court's dismissal of the claim against the City of San Antonio. 520 F.2d at 996.

Thornberry, Circuit Judge, filed opinion specially concurring.

See also, D.C., 415 F.Supp. 1258.

Betty Owen Stinson, Steven L. Seliger, Kent Spriggs, Tallahassee, Fla., for plaintiff-appellant.

Nadine Taub, Women's Rights Litigation Clinic, Joan Friedland, Newark, N. J., amicus curiae for American Public Health Assoc., Nat'l Abortion Rights Action League & American Civil Liberties Union.

Murray M. Wadsworth, M. Stephen Turner, Tallahassee, Fla., for Curry.

John C. Cooper, Tallahassee, Fla., for Griner.

J. Lewis Hall, Jr., Anne C. Booth, Tallahassee, Fla., for Messer.

E. Harper Field, Frank J. Santry, Tallahassee, Fla., for Mohammad, Curry, Crane, and Griner.

Michael I. Schwartz, Stephen Marc Slepin, Tallahassee, Fla., for Palmer.

Before WISDOM, THORNBERRY and RUBIN, Circuit Judges.

WISDOM, Circuit Judge:

This appeal from an antitrust summary judgment raises questions concerning the jurisdictional reach of the Sherman Act, the scope of the *Noerr-Pennington* defense, the *Parker* doctrine of state action immunity, and the applicability of Florida's anticombination statute to the medical profession. The Feminist Women's Health Center, Inc. ("the Center"), brought this action for injunctive and monetary relief against Drs. Mohammad, Curry, Knight, Crane, Griner, Messer, and Palmer (individually and in his capacity as Executive Director of the Florida Board of Medical Examiners ("BOME")). The Center alleged that the doctors conspired to boycott the Center's Tallahassee abortion clinic, and to fix the prices for abortions in the Tallahassee area in violation of federal and state antitrust laws. The Center further alleged that the doctors individually, and in combination, attempted to, and in fact did, monopolize the market for providing women's health and abortion services in the Tallahassee area. In addition, the Center complained that certain tactics used by the defendants amounted under Florida law to tortious interference with the Center's business relationships with its physicians. After extensive pretrial discovery, the trial court granted summary judgment in favor of all defendants on all counts, and the Center brought this appeal. The doctors cross-appeal the trial court's early ruling denying their motion for summary judgment for lack of subject matter jurisdiction. We affirm the trial court's jurisdictional ruling and its order with respect to the state law antitrust counts and reverse on all other points.

I

BACKGROUND

Because this appeal arises from a summary judgment, the statement of the background of the case is drawn from a record that reflects numerous disputed or potentially disputable issues of fact. Summary judgment having been entered against the plaintiff Center, the following discussion views disputed issues of fact in a manner favorable to the plaintiff.

The Feminist Women's Health Center, Inc., a Florida nonprofit corporation, operates the Women's Choice Clinic, a women's health and first trimester elective abortions clinic in Tallahassee, Florida. The Center was incorporated in 1974 and opened its office in Tallahassee on June 29, 1974. The Center employs ten to fourteen lay "health workers" and occasionally a laboratory technologist, a registered nurse, and a nurse-practitioner. The Center does not keep full time physicians on its staff, but rather uses physicians on a part-time basis to perform abortions, and, when possible, to provide "back-up" emergency services when patients develop post-operative complications. The Center charges about $150 for an abortion, $25 to $35 of which is paid by the Center to the operating physician.

Defendants Mohammad, Curry, Crane, Knight, Griner, and Messer are Tallahassee physicians specializing in obstetrics and gynecology. All are members of the gynecology and obstetrics staff ("OB–GYN Staff") of Tallahassee Memorial Hospital, the only hospital in Leon County, Florida, that has complete facilities for treating patients with obstetrical and gynecological problems. Defendant Palmer is a physician who practices in Tallahassee, and is Executive Director of the Florida Board of Medi-

cal Examiners, the body that licenses physicians and regulates the practice of medicine in the State of Florida.

Even before it opened its doors, the clinic was a matter of concern to the obstetrics and gynecological staff of Tallahassee Memorial. At its regular monthly staff meeting in May, 1974 the OB–GYN Staff adopted a resolution that it would not "approve" the Center if no member of the hospital staff were associated with the Center. The resolution, according to Dr. Brickler, the member of the OB–GYN Staff who first brought the Center to the staff's attention, was intended to express the staff's concern that the clinic have an "acceptable" local physician who would be available to take care of post-operative emergencies.

Despite some initial difficulties in recruiting physicians, the clinic operated without substantial controversy its first year. In the Spring of 1974, Lynn Heidelberg and Linda Curtis, two of the Center's directors, approached Drs. Brickler and Mohammad about working at the clinic. According to Ms. Curtis, Dr. Mohammad initially expressed interest in doing so, but at a second meeting changed his mind, citing pressure from his colleagues as well as the May resolution of the OB–GYN Staff. Dr. Mohammad indicated that he might consider working at the clinic, but only at a fee of $100 per procedure, a figure that is approximately triple the fee customarily received by operating physicians at the clinic. Dr. Brickler, on the other hand, decided to work at the clinic after having initially expressed fears that the OB–GYN Staff would disapprove of his doing so. Dr. Brickler informed the Center, however, that he would associate with the clinic on the condition that the clinic not advertise its services. The Center agreed and Dr. Brickler began his work for the clinic. In April 1975 Dr. McWilliams, another member of the Tallahassee Memorial OB–GYN Staff, began performing abortions at the clinic and handling post-operative aftercare. Drs. Brickler and McWilliams performed 816 abortions at the clinic that first year.

The clinic's difficulties began in June of 1975 when Linda Curtis gave an interview to the *Tallahassee Democrat,* the city's daily newspaper. The interview resulted in the publication in the June 20 edition of the *Democrat* of an article in which Ms. Curtis described the clinic and favorably compared its services with hospital abortion procedures. In particular, the interview emphasized the relative inexpensiveness of first trimester elective abortions at the clinic, and the advantages to women of choosing a place where "women set the pace for what goes on". The next day, Dr. Brickler terminated his relationship with the clinic, apparently because of the article.

The newspaper article succeeded in making the clinic, once again, a subject of great interest to the OB–GYN Staff at Tallahassee Memorial. At the July 1, 1975 meeting of the OB–GYN Staff, at which Drs. Messer, Griner, Crane, and Mohammad were present, Dr. Messer noted that Dr. Brickler was no longer working at the clinic and that an out-of-town physician was working there. The staff discussed the question of the ethics of the clinic's advertising, and concluded that physicians should not associate with organizations that advertise their medical services. The staff decided to bring the matter of the clinic's advertising to the attention of the State Board of Medical Examiners. The minutes of that meeting record that "Dr. Brickler commented he feels the local situation will collapse if it does not get support from the Obstetricians". A day or so after that meeting, Dr. McWilliams, who had attended the meeting, called the Center to inform it that he could not continue working at the clinic unless the controversy concerning the clinic's advertising was straightened out. He informed the clinic that Dr. Mohammad was upset about the newspaper article. In the days following the July 1 meeting Ms. Curtis met with Dr. Mohammad, who said that the Center should stop all advertising and that those associated with it should not make speeches about the Center. At that time Dr. Mohammad agreed to arrange an emergency meeting of the OB–GYN Department so that representatives of the

Center could meet the other members of the staff. When Ms. Curtis and another director of the Center arrived for the emergency meeting on July 8 or 9 only Dr. Mohammad was present. Dr. McWilliams stated in his deposition that he was notified of a meeting earlier that day, but was not informed about the purpose of the meeting and therefore failed to attend. No further meeting was scheduled. Dr. McWilliams testified that he again raised the question of such a meeting with Dr. Mohammad, but Dr. Mohammad informed him that he had polled the other members of the staff and that no one wished to meet with representatives of the Center.

At the next monthly meeting of the OB–GYN Service on August 5, 1975, the staff passed a motion that the Service write a letter to the Capitol Medical Society ("CMS"), a private organization of Tallahassee area physicians, expressing the doctors' view that physicians in the CMS should not associate with organizations that advertise their medical services. Dr. McWilliams spoke up to explain that he was unaware when he began working for the Center that the clinic was controversial because of its advertising and its nonprofit status. He revealed to the staff that he had told the clinic of his plans to leave if the controversy was not settled. Four days later, he told the Center that he would have to leave, citing the controversy and his desire not to fall into disfavor with his colleagues. As Dr. McWilliams explained in his deposition, he chose to leave "because of something that I was doing that they [the Tallahassee OB–GYNs] considered unethical". Shortly thereafter, Dr. McWilliams left the clinic.

About the time that Dr. McWilliams left the clinic, the Center called upon Dr. Brickler, who had severed his relations with the clinic some months earlier, in an effort to recruit him to handle backup or post-operative emergencies, either on a formal or an informal basis. Dr. Brickler, according to his deposition, told the Center that if it referred a patient to his office for post-operative care he would see the patient, just as he would see any other patient. He

declined, however, to enter any formal arrangement with the Center. Brickler indicated that to do so would involve him in controversy with his fellow obstetricians. The OB–GYNs, according to Brickler's deposition, "almost literally sleep together", and his colleagues could make things very unpleasant for him; they could, for example, refuse to take his patients were he to leave town.

Beginning in July or August 1975, the clinic began to rely heavily on the services of residents-in-training at the University Hospital in Jacksonville. The Center had arrangements with the Jacksonville residents that they would come to Tallahassee one day a week to perform abortions at the clinic. On August 29 the OB–GYN Staff sent a letter to defendant Palmer, Executive Director of the BOME, stating that out-of-town doctors were performing surgery at the clinic without adequate provision for continuous aftercare, in possible violation of the Florida Medical Practice Act. The letter requested Dr. Palmer to take "appropriate corrective measures". Acting on the staff's complaint, as he was required to do by law, Dr. Palmer visited the clinic, accompanied by Ed McCollum, the Chief Investigator of the BOME, to view its operations and to determine what doctors were practicing there. He found that Dr. Walker Whaley, a resident physician from University Hospital in Jacksonville, was performing abortions at the clinic. Dr. Palmer inquired about aftercare coverage of the clinic's abortion patients, and was told by Ms. Curtis that the clinic had arrangements with Tallahassee Memorial to take care of post-operative complications. Later that day, Dr. Palmer called the hospital concerning the clinic's backup coverage. The hospital administrator informed Palmer that the backup arrangements were not formal, but that he had told Ms. Curtis that any clinic patient could come to the hospital's emergency room for attention, as in the case of any person in need of immediate medical care.

Dr. Palmer then called Dr. Whaley on the telephone. After first identifying himself

as the Executive Director of the BOME, and telling Dr. Whaley that the telephone call was personal in nature, Palmer told Whaley that his, Dr. Whaley's, activities were not in his opinion illegal, but that his personal advice was that it might be in Whaley's best interests to leave the clinic. Dr. Palmer thought that it was unwise for the young physician to get involved in something as controversial as the clinic. He pointed out that the aftercare arrangements were in his opinion "questionable", and that Dr. Whaley was running a risk of malpractice liability because he could not follow up on his patients at Tallahassee Memorial Hospital inasmuch as Whaley did not have staff privileges at Tallahassee Memorial, nor a Tallahassee or Leon County occupational license. Following his conversation with Dr. Whaley, Palmer called Dr. Mohammad to report his findings. On September 30, Dr. Palmer sent another investigator to the clinic to determine if the clinic, at that time, had a licensed physician performing abortions.

At the September 2, 1975 meeting of the OB–GYN Staff of Tallahassee Memorial, at which Drs. Crane, Curry, Griner, Messer, and Mohammad were present, the staff voted to send a letter to the residents at University Hospital in Jacksonville who were performing abortions at the clinic. The purpose of the communication was to inquire of the doctors whether proper aftercare was being provided for the patients on whom the doctors were performing abortions at the Tallahassee clinic. On September 10, a letter, signed by all the defendants with the exception of Dr. Palmer, was sent not to the residents but to Dr. Robert Thompson, the head of the residency program at University Hospital. The letter stated:

In the last monthly meeting of the OB–GYN Staff at Tallahassee Memorial Hospital, the subject of the Feminist Womens' Health Clinic was brought up, and the fact that one or two of the residents from your program performed abortions without provision for possible complications and leave patients without provision for 24-hour coverage was discussed.

For your information, the Feminist Womens' Health Center has no backup for abortions performed and there is no physician in town covering aftercare complications of procedures done.

Dr. Whaley returned to the clinic after Dr. Palmer's call, but he told the Center that he could not work for them until the controversy was resolved. Dr. Whaley testified in his deposition that the aftercare problem was not the main reason that he left the clinic. His primary concern, he said, was the controversy between the clinic and the Tallahassee medical community. He ultimately left the clinic, he testified, because of the advice given him by several people.

Another of the residents at University Hospital in Jacksonville, Dr. Rhett, left the clinic in mid-September of 1975, following the staff's communication to Dr. Thompson. According to Dr. Rhett's deposition, he left the clinic because he could not get a straight answer from the clinic concerning its aftercare arrangements. He also testified that he felt threatened professionally by the controversy surrounding the Center.

The Center brought suit charging that the doctors had conspired to monopolize and restrain trade in the provision of abortions and related services, in violation of §§ 1 and 2 of the Sherman Act and § 542.05 of the Florida statutes. The Center also charged that the doctors had unlawfully interfered with the Center's contractual relations with its physicians. Following the Center's filing of the complaint, the Capitol Medical Society passed a resolution, coauthored by Dr. Palmer, to support the defendants in the prosecution of this litigation. The Center, throughout this litigation, has cited the Capitol Medical Society's resolution as the "consummation" of the alleged conspiracy. On June 9, 1976 the trial court denied the Center's motion for a preliminary injunction. The court found that the plaintiff had demonstrated a substantial likelihood of prevailing on the merits of its claims against all defendants except Dr. Palmer,

but that there was no likelihood that the Center would suffer irreparable harm pending adjudication of the cause. *Feminist Womens' Health Center v. Mohammad*, 1976, N.D.Fla., 415 F.Supp. 1258. The court intimated, in that order, that the "state action" defense of *Parker v. Brown*, 1943, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315, might be applicable to Dr. Palmer. In a pretrial order of September 3 the court granted Dr. Palmer's motion for summary judgment. On December 3, the court rendered summary judgment in favor of the remaining defendants.

## II

## THE REACH OF THE SHERMAN ACT

At the outset we face the question whether the district court had subject matter jurisdiction of this action. Jurisdiction is predicated upon §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, which grant the federal district courts jurisdiction of private actions for treble damages and injunctive relief, respectively, to redress injuries resulting from violations of the federal antitrust laws. The appellees argue that subject matter jurisdiction is lacking because the action complained of does not have the effect on interstate commerce requisite to liability under the Sherman Act. If the Center has not stated a claim under the Sherman Act, then the federal court, of course, lacks jurisdiction of the pendent state law claims.

■ Section 1 of the Sherman Act outlaws every combination or conspiracy "in restraint of trade or commerce among the several States". Section 2 of the Act prohibits monopolization of, and attempts and conspiracies to monopolize "any part of the trade or commerce among the several States." It has been said that "this language defines both the prohibited conduct and the jurisdictional range of the statute." Comment, 21 Vill.L.Rev. 721, 725 (1976); *see also Rasmussen v. American Dairy Ass'n*, 9 Cir. 1972, 472 F.2d 517, 521. The

Supreme Court has construed the Sherman Act as reaching the full extent of the Congress's power under the commerce clause. Whether the conduct complained of falls within the scope of the Sherman Act's "jurisdiction" turns on whether it has or could likely[1] have a substantial effect on interstate commerce. *E. g., International Salt Co. v. United States*, 1947, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20; *Lehrman v. Gulf Oil Corp.*, 5 Cir. 1972, 464 F.2d 26, *cert. denied*, 409 U.S. 1077, 93 S.Ct. 687, 34 L.Ed.2d 665.

■ The district court determined, after a full evidentiary hearing on the matter, that it had jurisdiction of the Center's claims. The court made the following findings. (1) Tallahassee, Florida, where the clinic is located, is within 30–35 miles of the Georgia state line. (2) Tallahassee is a center for health care in the northern Florida-southwestern Georgia area. (3) From June 1974 to September 1976, 2,177 abortions were performed at the plaintiff's clinic, 176 (or 8%) of which were performed on persons who came from outside the state of Florida. Abortions for out-of-state patients brought the plaintiff roughly $26,400 in gross receipts. (4) From June 1974 through April 1976 the Center received $562.00 in payments from out-of-state insurance companies for abortions performed at the clinic. (5) From June 1974 through September 1976 the Center made out-of-state purchases of $10,017.34 of supplies and equipment to be used in connection with the provision of abortion services. At least $9,845.34 of these supplies were purchased in the period of June 1974 to April 1976. (6) In that same period the Center purchased $15,493.79 of supplies from within the state of Florida. (7) From June 1974 through July 1976 the Center spent $4,340.65 on interstate travel by its officers and employees. (8) From the Center's inception, the volume of patients and the gross income of the clinic steadily increased. The district court found that the clinic had developed significant contacts with interstate activity, and that its interstate connections are likely to

1. Antitrust plaintiffs need not await complete ruin before asserting their rights. *See Golf* *City, Inc. v. Wilson Sporting Goods Co., Inc.*, 5 Cir. 1977, 555 F.2d 426.

grow as the business grows. Taking the allegations of the complaint as true, the court concluded, the clinic and its interstate business were seriously threatened by the defendants' actions.[2]

The defendants do not quarrel with the district court's findings of fact, but do contest its conclusion that the facts show a quantum of interstate involvement sufficient to sustain Sherman Act jurisdiction. They argue that the Center's business is not converted into an interstate business by virtue of the clinic's treatment of patients who travel from other states to use its services. Indeed, they seem to maintain that the flow of out-of-state patients must be ignored altogether. Once the interstate flow of patients is discounted, the physicians contend, the interstate connection is de minimis and certainly far more tenuous than any that has been held sufficient for Sherman Act purposes in any reported case. We disagree with both contentions; we hold that the district court did not err.

█ Although the mere fact of dealings with out-of-state customers, whether or not those customers cross state lines for the purpose of buying a firm's goods or services, might not of itself establish a sufficient interstate nexus, it does not follow that those dealings are of no pertinence whatsoever. The Sherman Act reaches conduct that is likely to have a substantial adverse effect on interstate commerce, a question, as we have emphasized in prior decisions, that is to be determined from the aggregate of factors. *St. Bernard General Hospital, Inc. v. Hospital Service Ass'n*, 5 Cir. 1975, 510 F.2d 1121, 1125; *Lehrman v. Gulf Oil Corp.*, 5 Cir. 1972, 464 F.2d 26, 48, *cert. denied*, 409 U.S. 1077, 93 S.Ct. 687, 34 L.Ed.2d 665. The plaintiff's business with out-of-state patients is one of the factors to be considered. Were the Center forced to close the Tallahassee clinic, the flow of persons crossing state lines to avail themselves of the clinic's services would cease. That the patients come to the plaintiff, and not the plaintiff to the patients, does not alter the interstate character of those transactions.[3]

Looking to the aggregate of factors, including the clinic's volume of out-of-state patients, we cannot say that the Center has failed to demonstrate a likelihood of substantial impact on interstate commerce. There is, of course, no ready and easy test for determining whether particular restraints have, or will likely have, the requisite effect on interstate commerce. As the Third Circuit Court of Appeals has observed, "the precedent in this area is unlikely to dictate the outcome in any given case. Instead, it is more likely to communicate a general sense as to how much of an impact

**2.** In determining the jurisdictional issue the district court refused to consider the interstate flow of Medicaid payments received by the Center. On appeal, the Center (the cross-appellee on this issue) has urged that the trial court should have taken those payments into account, citing *Alabama Optometric Ass'n v. Alabama State Board of Health*, 1972, M.D. Ala., 379 F.Supp. 1332. Since we affirm the trial court's jurisdictional ruling in favor of the Center, we need not address that issue.

**3.** This Court's recent decision in *McLain v. Real Estate Board of New Orleans, Inc.*, 5 Cir. 1978, 583 F.2d 1315, is not to the contrary. That case involved a civil action alleging that real estate brokers fixed prices in connection with the sale of real estate in the New Orleans area. The court applied the substantial effects test and held that Sherman Act jurisdiction is not conferred by the allegation "that many of the defendants' customers are 'persons moving into and out of the Greater New Orleans area.' " 583 F.2d at 1320. We do not read the *McLain* opinion to say that the flow of out-of-state customers is not a factor to be considered in determining jurisdiction, nor even that jurisdiction can never attach on the sole basis of transactions with out-of-state customers. The court held that residential real estate brokerage activities do not substantially affect interstate commerce because the interstate consequences are remote or incidental. 583 F.2d at 1320 & n. 4. That conclusion is unassailable, because few people cross state lines *for the purpose* of purchasing residential real estate. The effects of the conduct alleged in this case, accepting the allegations of the complaint as true, cannot be characterized as "remote" or "incidental", however, for the district court found that Tallahassee is a regional, interstate center for the provision of medical services. A fair implication from this finding is that persons cross the Florida-Georgia state line for the purpose of coming to the Center's Tallahassee clinic.

local activities must have upon interstate commerce before they confer jurisdiction." *Doctors, Inc. v. Blue Cross of Greater Philadelphia*, 3 Cir. 1973, 490 F.2d 48, 51. The interstate effects alleged here are well within the boundaries suggested by the "general sense" of our decisions on Sherman Act jurisdiction.

In *Lehrman v. Gulf Oil Corp.*, 5 Cir. 1972, 464 F.2d 26, *cert. denied*, 409 U.S. 1077, 93 S.Ct. 687, 34 L.Ed.2d 665, this Court upheld jurisdiction in a case analogous to this one in its jurisdictional aspects. *Lehrman* was a private antitrust suit by a Gulf service station operator. Lehrman sought to recover damages that resulted from the effect on his business of Gulf's wholesale pricing practices. He urged that Gulf's pricing policies, by preventing him from engaging in price competition with nearby competitors, forced him out of business. Although we assumed, for purposes of the appeal, that the gasoline sold by the plaintiff never moved in interstate commerce, we nevertheless held that Gulf's conduct substantially affected interstate commerce. Two distinct and sufficient grounds for jurisdiction were set forth. First, we noted that Gulf's pricing system affected dealers throughout the southwestern United States, many of whom, the evidence tended to show, did distribute gasoline that moved in interstate commerce. Thus the pricing system as a whole constituted a combination that substantially restrained interstate commerce. The alternative ground is of importance to this appeal. We pointed out that Lehrman sold not only gasoline, but also tires, batteries, and accessories, the largest part of which, unlike his gasoline, originated from outside the state of Texas. The termination of Lehrman's business, we held, had an appreciable effect on the flow of tires, batteries, and accessories from outside Texas. We stated: "The effect was appreciable because, while small relative to total Gulf TBA sales, the gross amount of such sales would be significant over the extended period of time Lehrman might have been able to continue in business." *Id.* at 35.

The case of *Copper Liquor, Inc. v. Adolph Coors Co.*, 5 Cir. 1975, 506 F.2d 934 presented a similar situation. In *Copper Liquor* an owner of a retail liquor store sued the defendant brewing company complaining that the refusal of Coors's local distributor to sell him Coors beer was part of a conspiracy to fix retail prices, and that his inability to secure the beer from other distributors was the consequence of an unlawful scheme of territorial market division. We upheld Sherman Act jurisdiction, pointing to evidence showing that the unavailability of Coors beer at the plaintiff's retail store diminished customer demand for the plaintiff's other products that did move in interstate commerce. Citing *Lehrman*, we observed: "This impact on other products has been held to have a sufficient effect on interstate commerce to bring the case within the federal antitrust laws." *Id.* at 949.

The activities affected by the restraints alleged in this case have an interstate nexus at least as substantial as those involved in *Lehrman* and *Copper Liquor*, and those authorities therefore counsel affirmance of the district court's ruling on jurisdiction. In *Lehrman*, jurisdiction was founded on the impact of Gulf's activities upon the TBA items purchased and sold by a service station operator. That effect could hardly be more substantial than the cessation of the Center's purchases of $4,000 or $5,000 worth of out-of-state supplies a year and of the clinic's $12,000 worth of yearly business with out-of-state patients. The interstate nexus in *Copper Liquor* was even less substantial, for the plaintiff in that case did not contend, as the Center does here, that the challenged practices threatened to shut down his business, and with it his purchases of products in interstate commerce.

We conclude, from all the evidence adduced at the jurisdictional hearing before the district court, that the court ruled correctly. We recognize that there must be a limit on the reach of Sherman Act jurisdiction. This case, however, is within that limit.

## III

### THE MEMBERS OF THE OB–GYN STAFF

The district court granted summary judgment in favor of Drs. Mohammad, Cur-

ry, Crane, Knight, Griner, and Messer largely on the strength of the *Noerr-Pennington* doctrine. According to that doctrine, articulated in a line of Supreme Court decisions that began with *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 1961, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464, efforts to influence the government to take anticompetitive action cannot be made the basis of antitrust liability. *Noerr* itself concerned efforts to achieve anticompetitive ends by securing legislative action. Succeeding court decisions established that antitrust immunity extends to attempts to influence executive[4] and adjudicative[5] governmental bodies as well. The Court has held that petitioning activity is protected "regardless of intent or purpose." *United Mine Workers v. Pennington,* 1965, 381 U.S. 657, 670, 85 S.Ct. 1585, 14 L.Ed.2d 626. The petitioning activity, however, must be genuine. Protection does not extend to purported petitioning that is in fact "a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor . . . ." *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 1961, 365 U.S. at 144, 81 S.Ct. 523, 533. Although the Court's *Noerr* opinion suggested that petitioning activity is exempt because the Sherman Act was simply not designed to reach such conduct, it is now clear that the doctrine is rooted in the first amendment's guarantee of the right to petition. *See California Motor Transport Co. v. Trucking Unlimited,* 1972, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642; *see generally* Fischel, *Antitrust Liability for Attempts to Influence Government Action: The Basis and Limits of the Noerr-Pennington Doctrine,* 45 U.Chi.L.Rev. 80 (1977).

■ The trial court held the following conduct to be of the type protected by the *Noerr-Pennington* defense: (1) The OB–GYN Committee's letter to Dr. Palmer and the BOME; (2) the Committee's letter to Dr. Thompson, the head of the residency program at the Jacksonville hospital; (3) the Committee's communications to the Capitol Medical Society regarding the Center's abortion clinic; and (4) the discussions among the members of the OB–GYN staffs of Tallahassee Memorial and the Jacksonville hospital regarding their members' medical practice. Since these communications, in the district judge's opinion, make up the core of the Center's case against the physicians, he ruled that the fate of the action turned on whether the Center could bring it within the "sham" exception adumbrated in the Supreme Court's *Noerr* opinion. Finding that the plaintiff had insufficient evidence that the defendants' petitioning activities were sham, the court granted the defendants' motions for summary judgment.

The foundation of the trial court's ruling was its determination that the defendants' communications were protected petitioning activity. We hold, however, that the communications, with the exceptions of the physicians' letter of complaint to the BOME and their post-complaint activities in support of their position in this lawsuit, are as a matter of law unprotected by the *Noerr-Pennington* doctrine. In addition, a triable issue of fact remains as to whether the OB–GYNs' letter of complaint to Dr. Palmer was but a sham effort to influence government action. The district court's misapplication of the *Noerr* doctrine necessitates reversal of the judgment.

■ The Committee's letter of complaint to Dr. Palmer is a form of activity that is protected by the *Noerr-Pennington* doctrine absent proof of sham. The Board of Medical Examiners is a creature of state law. Section 458.1201 of the Florida Statutes authorizes the Board to discipline licensed physicians found guilty of any of the violations defined by chapter 458. The defendant doctors wrote Dr. Palmer requesting him to investigate possible violations of

---

4. *United Mine Workers v. Pennington,* 1965, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626.

5. *California Motor Transport v. Trucking Unlimited,* 1972, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642.

the Medical Practice Act. Whether the doctors' petition is immune from antitrust attack turns on the factual determination whether it was genuinely intended to influence Dr. Palmer to take official action in his capacity as Executive Director of the BOME.[6] It is the jury's task to resolve this issue.

We agree with the district court, however, that the Center cannot base a right to recovery on the actions of Dr. Palmer and the other members of the Capitol Medical Society in adopting a resolution to provide moral and financial support to the doctors' defense of this lawsuit. The plaintiff Center characterizes the medical society's resolution of support as the "consummation" of the alleged conspiracy. In *California Motor Transport Co. v. Trucking Unlimited*, 1972, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642, the Supreme Court held that joint efforts of competitors to seek adjudicative action are protected. The first amendment right of competitors to join in petitioning courts and administrative bodies entails the right to band together for purposes of supporting litigation, as the physicians in the Capitol Medical Society have

done here. Whether the action of the medical society can be linked to the alleged conspiracy that spawned the Center's original complaint is irrelevant, for petitioning activity according to *Pennington* "is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act." 381 U.S. at 670, 85 S.Ct. at 1593. The district court did not err in granting summary judgment in favor of the defendants on this issue. There is no genuine issue as to the physicians' intent in adopting the resolution. It cannot be seriously urged that either the physicians' defense of this lawsuit or the medical society's resolution of support is a sham.[7]

The district court's determination that the other communications are protected rests on three statutes that, in its view, make the OB–GYN staffs and the Capitol Medical Society integral parts of the state's apparatus for regulating the practice of medicine. Section 768.40 of the Florida Statutes immunizes "medical review committees", such as local societies of health care providers and the medical staffs of licensed hospitals, from liability arising out of their actions taken in the course of eval-

6. The court required the plaintiff to meet the high burden of proof of sham conduct suggested by the Supreme Court's opinion in *Otter Tail Co. v. United States*, 1973, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359. In *Otter Tail* the Court stated that antitrust liability may attach "where the purpose to suppress competition is evidenced by repetitive lawsuits carrying the hallmark of insubstantial claims". 410 U.S. at 380, 93 S.Ct. at 1031. *See also California Motor Transport Co. v. Trucking Unlimited*, 1972, 404 U.S. 508, 513, 92 S.Ct. 609, 30 L.Ed.2d 642. *Otter Tail* and *California Motor Transport* ac- knowledge that a showing of a pattern of repet- itive, baseless claims is strong evidence of sham petitioning, but they do not hold that such evidence is *essential* to proof of sham. The *Noerr* doctrine presents no bar if the plain- tiff proves that the petitioning was not a genu- ine effort to influence public officials to take governmental action. *See California Motor Transport*, 404 U.S. at 511–512, 92 S.Ct. 609; *see generally* Fischel, *Antitrust Liability for At- tempts to Influence Government Action: The Basis and Limits of the* Noerr-Pennington *Doc- trine*, 45 U.Chi.L.Rev. 80, 106–110 (1977). Ab- sent clear direction from the Supreme Court, we see no reason for erecting a special, high burden of proof on this issue.

7. Moreover, it would be improper to admit evi- dence of the medical society's meeting and res- olution. Evidence of activity that is protected by the *Noerr* doctrine may be admitted to show the purpose and character of other activity if doing so is not overly prejudicial to the defend- ants. *United Mine Workers v. Pennington*, 381 U.S. at 670–71 n. 3, 85 S.Ct. 1585; *Household Goods Carriers' Bureau v. Terrell*, 5 Cir. 1971, 452 F.2d 152, 158 n. 18. Admissibility, we think, should be governed by a test that weighs the probativeness of and the plaintiff's need for the evidence against the danger that admission of the evidence will prejudice the defendant's first amendment rights. The medical society's meeting and resolution have some evidentiary bearing on the character of the doctors' other actions and may aid in demonstrating Palmer's sympathies, but the probative value of this evi- dence is low. As evidence of the alleged con- spiracy it is cumulative. As evidence of Dr. Palmer's state of mind it is exceedingly weak, for at the time the resolution was co-authored by Palmer he was already a party defendant to this suit. Its evidentiary value to the plaintiff is far outweighed by the defendants' first amendment interests.

uating the performance of health care providers. The statutes contemplate committees that concern themselves with the quality and cost of medical services rendered by providers. Section 395.065 authorizes the medical staff of licensed hospitals "to suspend, deny, revoke, or curtail the staff privileges of any staff member for good cause". The statute enumerates a few nonexclusive grounds constituting "good cause" and immunizes the hospital, staff, and staff members from liability arising out of actions taken in good faith in carrying out the staff's disciplinary function. Section 458.-1201, the statute setting forth the disciplinary powers of the BOME, authorizes the Board to impose penalties on licensed physicians who have been disciplined by a peer review association or a hospital medical staff, and requires such organizations to report all disciplinary actions to the BOME.[8] § 458.1201(1)(p). The court felt that these statutes, in effect, make the OB–GYN staffs and the Capitol Medical Society public regulatory bodies, and that the discussions at the OB–GYN Committee meet-

ings and the Committee's letters to the Jacksonville OB–GYN's and the medical society were therefore protected solicitation of government action.

 The defendants' claim of *Noerr* protection, in our view, rests ultimately on § 458.1201. Section 768.40 does not recruit medical review committees into government service. The sole purpose of that provision is to confer limited immunity upon the actions of review committees within the scope of their functions, as defined by subsection (1) of § 768.40, and to bar the use of committee records and proceedings as evidence in civil actions.[9] Section 395.065 recognizes the existence of hospital staff self-regulation, imposes a "good cause" limitation on disposition of staff privileges, and insulates good faith disciplinary action from civil liability. This falls short of conferring governmental status upon hospital medical staffs.[10] Section 458.1201, however, affords a colorable basis for the defendants' claim. The statute, by enabling the BOME to take disciplinary action against physicians who have been disciplined by medical review

---

**8.** The relevant portions of § 458.1201 provide as follows:

(1) The board shall have authority to deny an application for a license or to discipline a physician licensed under this chapter or any antecedent law who, after hearing, has been adjudged unqualified or guilty of any of the following:

 \* \* \* \* \* \*

(p) Being removed or suspended, or having disciplinary action taken by his peers within any professional medical association, society, professional standards review organization established pursuant to section 249F of Public Law 92–603, or similarly-constituted professional body, whether or not such association, society, organization, or body is local, regional, state, national, or international in scope, or by being disciplined by a licensed hospital or medical staff of said hospital for immoral or unprofessional conduct or willful misconduct or negligence by the person in his capacity as a physician licensed pursuant to this chapter. Anybody taking action as set forth in this paragraph shall report such action to the board within 30 days of its occurrence or be subject to a fine assessed by the board in an amount not exceeding $500.

 \* \* \* \* \* \*

(3)(a) When the board finds any person unqualified or guilty of any of the grounds

set forth in subsection (1), it may enter an order imposing one or more of the following:

 1. Deny his application for a license;

 2. Permanently withhold issuance of a license;

 3. Administer a public or private reprimand;

 4. Suspend or limit or restrict his license to practice medicine for a period of up to five years;

 5. Revoke indefinitely his license to practice medicine;

 6. Require him to submit to the care, counseling, or treatment of physicians designated by the board;

 7. Require him to participate in a program of continuing education prescribed by the board;

 8. Require him to practice under the direction of a physician in a public institution, a public or private health care program, or private practice for a period of time specified by the board.

**9.** Florida's Medical Practice Act cannot, of course, operate to bar the use of such evidence in the trial of a federal cause of action.

**10.** Moreover, the defendants do not argue that the communications in issue had anything to do with possible action regarding any physician's staff privileges.

organizations, vests those organizations with a kind of quasi-legislative authority. The appellees' strongest argument for *Noerr* protection is that communications between a review organization and its members looking towards possible disciplinary action constitutes the solicitation of action that, in the event it became the basis of BOME disciplinary action, would be legislative in character.

 We are not persuaded, however, that § 458.1201 makes medical review organizations public regulatory bodies. The contention that § 458.1201 incorporates the disciplinary actions of such organizations into regulatory law is weakened by the statute's permissive language. Subsection (1) does not *require* the BOME to take action against physicians disciplined by private professional groups; it merely authorizes the Board to do so. Subsection (3)(a) of the statute simply provides that the Board "may enter an order" penalizing phy-

sicians who are found to have violated the statute. Thus the Board is given broad discretion to decline to take action against physicians. Where the legislature, in § 458.1201, intended to command a certain course of action, it made its intentions quite clear by using the word "shall".[11] As we read the statute, disciplinary action by a medical peer group affords grounds for Board action but in no way binds the Board to act. Thus, ultimate authority to enact and enforce professional standards and to adjudicate violations of law rests with the Board. Hospital medical staffs and medical societies play an important role in Florida's regulatory scheme,[12] but that role is not a governmental one.[13] Although the actions of such groups in reporting disciplinary findings and suspected violations to the BOME may be petitioning activity within the meaning of the first amendment, communications within those groups are not.[14]

11. Section 458.1201(5), for example, provides: "The board *shall* report to the President of the Senate and the Speaker of the House of Representatives on February 1 of each year . . . the status of the actions taken by the board in carrying out the responsibilities assigned to it under this section." (Emphasis added.) Subsection (1)(p) states: "Anybody taking action as set forth in this paragraph *shall* report such action to the board within 30 days of its occurrence or be subject to a fine assessed by the board in an amount not exceeding $500." (Emphasis added.)

12. Throughout the appellees' briefs runs the argument that free discussion will be chilled, and Florida's system of self-regulation severely hampered, if this Court does not rule that the conduct of the OB–GYNs is *Noerr*-protected. This is not, properly speaking, an argument from the first amendment's guarantee of the right to petition, but one from the amendment's guarantee of freedom of speech. If the facts, as fully developed, show that the OB–GYNs discussed the clinic and adopted certain resolutions concerning the clinic, a free speech question would be presented. If the facts suggested simply that certain physicians were persuaded by their colleagues that the clinic's mode of operations was detrimental to the public welfare, or that those physicians avoided the clinic simply out of the desire not to be poorly thought of by their colleagues, then the imposition of antitrust liability might implicate first amendment values. At this point in the litigation, however, the facts are insufficiently developed to speculate about the merits of a possible

free speech defense. We do note, however, that in cases involving antitrust challenges to professional rules and canons enacted ostensibly in the public interest, the Supreme Court has not suggested that the first amendment bars relief. *See National Society of Professional Engineers v. United States*, 1978, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637; *Goldfarb v. Virginia State Bar*, 1975, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572. It would seem anomalous to hold that the imposition of standards is not protected activity, but that the proposal and advocacy of standards in a manner bordering on imposition of standards is protected.

13. We do not imply that the disciplinary actions of the medical review groups would be governmental in character if the statute directed the BOME to take action against physicians disciplined by such groups. That question is not before us.

14. In his brief, appellee Curry contends that *Noerr* protection extends to the Tallahassee OB–GYNs' letter to Dr. Thompson at Jacksonville University Hospital in Jacksonville. His theory is that since the hospital is a county hospital operated by the Duval County Hospital Authority, the actions of the hospital staff and Dr. Thompson, head of the residency program, are "quasi-governmental". Dr. Curry does not, however, specify the kind of government action that the OB–GYNs were seeking. We do not think that any disciplinary action taken by Dr. Thompson would be any more governmental in

Evaluating the evidentiary materials on file in light of our ruling on the availability of the *Noerr-Pennington* defense, we conclude that there are triable issues of fact.[15] The district court itself in granting summary judgment recognized that, absent the *Noerr* issue, "the evidence might allow sufficient inferences to submit the case to a jury for decision." The appellants' primary argument in support of summary judgment is that the inferences raised by the Center's pleadings and evidentiary materials cannot stand in the face of contrary evidence that the doctors were motivated solely by concern for the welfare of the clinic's abortion patients. They rely on our decisions in *Solomon v. Houston Corrugated Box Co., Inc.*, 5 Cir. 1976, 526 F.2d 389, *Scranton Construction Co. v. Litton Industries*, 5 Cir. 1974, 494 F.2d 778, and *Scott Medical Supply Co. v. Bedsole Surgical Supply*, 5 Cir. 1974, 488 F.2d 934. The appellants misapprehend the teaching of those decisions. Those cases involved claims that the decisions of certain firms not to do business with the plaintiffs were the products of conspiracies or concerted refusals to deal. In each case the defendants prevailed because the plaintiff, in the face of strong evidence that the decisions not to deal were motivated by sound business reasons, failed to adduce concrete evidence that the decisions were other than unilateral. This case differs significantly, for here there is no lack of evidence that the defendants acted jointly.

The appellees also contend that summary judgment is proper because the case is governed by the rule of reason and their conduct was reasonable as a matter of law. They cite our decision in *Hatley v. American Quarter Horse Ass'n*, 5 Cir. 1977, 552 F.2d 646, in which we held that self-regulatory actions taken by industries that necessarily require a high degree of interdependence and cooperation should not be governed by rules of *per se* Sherman Act illegality absent "at least minimal indicia of anti competitive purpose or effect". *Id.* at 653. Critical to their attempt to bring this case within *Hatley's* warning against indiscriminate application of per se rules is the appellees' assumption that the Center's antitrust action against them is grounded *solely* on the defendants' attempts to impose certain standards of ethical and professional responsibility upon the plaintiff's operations. The *Hatley* case and the Supreme Court's decision in *Silver v. New York Stock Exchange*, 1963, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389, on which *Hatley* heavily relied, concerned attempts of antitrust plaintiffs to characterize the implementation of industry association standards as *per se* illegal boycotts. In *Silver* the plaintiffs' direct wire connections to the NYSE were terminated because of the plaintiffs' violations of the Exchange's regulations. In *Hatley* the plaintiff was denied registration of his colt as a quarter horse because the colt did not meet the association's breeding standards. In both cases the association action was tested by the rule of reason. The complaint in this case does allege that the defendants violated the Sherman Act by their acts in enforcing the standards of the profession. But it goes further. The complaint alleges intimidation and coercion of physicians. The Center contends that the defendants not only sought to enforce a certain standard for aftercare, but conspired to assure that the clinic would be

nature than disciplinary action taken by the Tallahassee OB–GYNs. The appellees have cited no statutes that authorize Dr. Thompson to take or threaten to take action respecting the status of residents simply because those residents have conducted themselves in a manner inconsistent with private standards of professional conduct that have never been adopted by an agency charged by law with promulgating such standards. Moreover, the plaintiff Center may be complaining that the Tallahassee OB–GYNs were seeking wholly unofficial action from Dr. Thompson. By the appellees' own

admission, the letter was sent to Dr. Thompson simply as a means of communicating to the residents themselves, to whom the OB–GYNs had originally resolved to write, that the aftercare arrangements at the plaintiff's clinic were questionable.

15. We limit our examination to the materials on file at the time the trial court entered summary judgment and ignore twelve affidavits filed by the Center after the court's entry of its order.

unable to meet that standard. Thus, we cannot say that the entirety of this case should be governed by the rule of reason. To the extent, moreover, that the Center relies on the theory that the imposition of the no-advertising and aftercare standards is itself an antitrust violation, we cannot say, at least on the present record, that the plaintiff has no hope of showing the "minimal indicia" of anticompetitive purpose that *Hatley* suggested might make *per se* treatment proper. Furthermore, a challenge to the defendants' efforts to enforce professional standards, even if governed by the rule of reason, could not be disposed of summarily, for triable fact issues remain as to the genuineness of the defendants' justification, the reasonableness of the standards themselves, and the manner of their enforcement.

██ Appellees argue, finally, that at least partial summary judgment is proper because the plaintiffs have no evidence of damage, and because the Center cannot make the showing, requisite to recovery for attempts to monopolize, that the defendants were or are dangerously close to monopoly power. The doctors argue that the Center cannot hope to prove damages because the clinic's business has actually flourished since the commencement of the alleged conspiracy. We do not agree that summary judgment on the issue of damages would be warranted on the existing record. Although the income of the clinic may have increased during and after the conspiracy, as the doctors contend, that fact would no more preclude proof of damage than a decrease in income, without more, would establish the fact of damage. We have no assurance that the growth of the clinic's business was not retarded by the alleged actions of the defendants. Nor do we agree that summary judgment as to the plaintiff's section 2 claim is in order. The allegations and evidence raise a genuine fact issue concerning the doctors' proximity to monopoly power. The OB–GYNs at Tallahassee Me-

morial were, prior to the opening of the clinic, the major, if not only, providers of abortion services in the Tallahassee area. The success of their alleged attempt to prevent other physicians from working at the clinic would have eliminated their only competition. We cannot say, at the present stage of this case, that the defendants were not dangerously close to possessing monopoly power.

Summary judgment of the Center's federal antitrust counts against the OB–GYNs must be vacated.[16]

## IV

### DEFENDANT PALMER

In its pretrial order of September 3, 1976, the trial court granted defendant Palmer's motion for summary judgment. The court's reasons were not set forth in the order, but an earlier memorandum of decision suggests that the court believed Dr. Palmer to be protected by the "state action" defense of *Parker v. Brown,* 1943, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315. The Center appeals that ruling, urging that there are triable issues of fact as to Palmer's role in the alleged conspiracy and as to whether his actions were "state action" within the meaning of the *Parker* doctrine.

### A. *The Coercion and Conspiracy Issues.*

██ Dr. Palmer urges that, even apart from a possible *Parker* defense, the trial court's entry of summary judgment was correct because the Center has come forward with no evidence of conspiracy and because the evidentiary matter on file establishes that Palmer's conduct was not coercive.

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted when affidavits, depositions, and other materials on file show "that there is no genuine issue as to any material fact and

**16.** On appeal, the Center has urged for the first time the claim that the defendants' conduct amounted to an attempt to regulate the accessibility of abortion services in violation of pa-

tients' privacy rights under the *Roe v. Wade* line of decisions. This claim was never raised before the trial court, and we see no need to address it at this time.

548

that the moving party is entitled to a judgment as a matter of law". The Center's evidence of coercion consists of Dr. Palmer's telephone conversation with Dr. Whaley, Whaley's subsequent departure from the clinic, and the follow-up trip made by one of Palmer's investigators to the clinic. The objective facts, including the substance of Palmer's advice to Dr. Whaley, are largely undisputed. The crucial factual dispute concerns the characterization of Palmer's conduct. This involves elusive questions of intent and motive, the type of questions that, the Supreme Court has warned, should seldom be disposed of by summary procedures. *Poller v. Columbia Broadcasting System, Inc.*, 1962, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458. The Center's allegations and evidentiary matter do raise triable issues concerning Palmer's intentions and the character of his words to Dr. Whaley, and the evidence adduced by Dr. Palmer does not decisively controvert the Center's version of the facts.

█ It suffices here to state Dr. Whaley's version of the telephone call. In his deposition Whaley recalled that Palmer advised him that it would benefit him to leave the clinic, inasmuch as the clinic was controversial and had questionable after care arrangements. Whaley ultimately left the clinic, he said, not "specifically" on Dr. Palmer's advice, but "because of the advice of several people and what I felt myself to be beneficial to me". Dr. Palmer points to this as establishing the absence of coercion. On the contrary, Whaley's account of the telephone conversation could be reasonably construed as suggesting that Palmer's call contributed to Whaley's decision to leave the clinic. The causation issue is surely not disposed of by Whaley's characterization of Palmer's advice as "helpful" and uncoercive. Nor does Dr. Whaley's account resolve issues concerning Dr. Palmer's state of mind. There are triable issues whether Dr. Palmer intended his communication as a subtle threat to Whaley's career or should reasonably have known that it would be construed as such, or whether Palmer simply intended, in all innocence, to give avuncular advice to the young physician. As in many antitrust cases, the conduct alleged takes it character from its context. Actions innocent and lawful in themselves become actionable when undertaken pursuant to an unlawful conspiracy. *Eastern States Retail Lumber Dealers Ass'n v. United States*, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914).

Palmer strenuously urges that the Center has no shred of evidence that he conspired with the other defendants. He argues that the Center has failed to set forth any theory of why he would have conspired. The only communications between himself and the other defendants, so far as the evidence shows, were the letter of complaint sent him by the OB–GYN Committee and his subsequent call to Dr. Mohammad reporting the results of his investigation. These communications, he says, evidence no agreement whatsoever. Thus, Dr. Palmer concludes, the plaintiff's allegations of conspiracy are unsupported by affidavits or depositions, and cannot stand in the face of Dr. Palmer's deposition answers to the contrary under our decision in *Saenz v. University Interscholastic League*, 5 Cir. 1973, 487 F.2d 1026.

This is not, however, a case of a plaintiff relying strictly on the strength of bare allegations, as in *Saenz*. The Center has set forth evidentiary matter and contends that the depositions and interrogatories permit the inference that Dr. Palmer conspired with the defendant physicians. It is common learning that summary judgment may be improper if the parties disagree about the inferences that may reasonably be drawn as to any material issue of fact. *Insurance Co. of North America v. Bosworth Construction Co.*, 5 Cir. 1972, 469 F.2d 1266, 1268; *Lighting Fixture & Electric Supply Co. v. Continental Ins. Co.*, 5 Cir. 1969, 420 F.2d 1211, 1213. The question presented, then, is whether the evidentiary matter adduced below supports a reasonable inference of conspiracy between Dr. Palmer and the other defendants. In addressing that question we must view the facts set forth in the materials in the light most favorable to the Center, the party opposing the summary judgment motion.

*Adickes v. S. H. Kress & Co.,* 1970, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142; *Time, Inc. v. Ragano,* 5 Cir. 1970, 427 F.2d 219, 221. Applying these principles, we find that there remains a triable issue as to Dr. Palmer's participation in the alleged conspiracy.

The evidentiary matter before the district court showed only one communication between the OB–GYNs and Dr. Palmer that occurred prior to Dr. Palmer's conversation with Dr. Whaley—the doctors' letter of complaint. The character of Dr. Palmer's actions after receiving the Committee's request, viewed against the background of the controversy brewing in the Tallahassee medical community, can reasonably give rise to an inference that Dr. Palmer embraced the alleged plans of the other defendants.[17]

 Against the Center's largely circumstantial evidence of a conspiracy between Dr. Palmer and the other defendants stands Palmer's testimony that his advice to Dr. Whaley was inspired solely by his concern for the young physician's professional welfare. Our decisions have established that evidence of conspiracy consisting wholly of a series of inferences cannot stand against overwhelming evidence that the challenged action was taken unilaterally for sound business reasons. *See, e. g., Solomon v. Houston Corrugated Box Co., Inc.,* 5 Cir. 1976, 526 F.2d 389; *Scott Medical Supply Co. v. Bedsole Surgical Supply,* 5 Cir. 1974, 488 F.2d 934. We cannot say, however, that Dr. Palmer's evidence as to motive is so convincing that an inference of conspiracy could not reasonably be drawn. It is, concededly, not clear what personal stake Dr. Palmer might have had in a scheme such as the Center alleges here. But we reject Palmer's contention that an easily discernible motive is an essential element in a § 1 conspiracy claim. The apparent absence of motive may be probative of a defendant's innocence, but it does not, of itself, preclude taking a case to the jury.

**B. *The* Parker *Defense.***

 The "state action" exemption from antitrust liability is generally said to have originated in *Parker v. Brown,* 1943, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315, in which the Supreme Court held that an anticompetitive agricultural program established by California law was immune from Sherman Act attack. The Court found no basis in the language or history of the Sherman Act suggesting that the Act was designed "to restrain a state or its officers or agents from activities directed by its legislature". *Id.* at 350–51, 63 S.Ct. at 313. Antitrust liability cannot, therefore, be premised on anticompetitive market effects that are imposed by an act of government.

 We have held that the acts of a subordinate state governmental entity are immune from antitrust challenge to the extent that they are "comprehended within the powers granted to it by the Legislature". *City of Lafayette v. Louisiana Power & Light Co.,* 5 Cir. 1976, 532 F.2d 431, 434, *aff'd,* 1978, 434 U.S. 811, 98 S.Ct. 1123,

17. We are aware that, as Dr. Palmer urges, an agreement to violate the law is the essence of conspiracy. *Joseph E. Seagrams and Sons, Inc. v. Hawaiian Oke Liquors,* 9 Cir. 1969, 416 F.2d 71, *cert. denied,* 1970, 396 U.S. 1962, 90 S.Ct. 752, 24 L.Ed.2d 755. We hold only that there is a triable issue as to whether Dr. Palmer and the other defendants arrived at some form of agreement. Palmer urges that he had no opportunity to conspire inasmuch as he never discussed the clinic with the other defendants before they sent the letter of complaint. Although it is true that the Center has cited no direct evidence of such a communication, and Dr. Palmer has denied that he spoke with the others before he called Dr. Whaley, we think the Center is entitled to try the issue to a jury.

We note that prior to Dr. Palmer's visit to the clinic and his call to Dr. Whaley the OB–GYN Staff had on two or three occasions written to the Capitol Medical Society—of which Dr. Palmer is a member—complaining about the clinic and asking the CMS to take action regarding the clinic. Moreover, it is clear that Dr. Palmer did have an opportunity to discuss the clinic with the defendants prior to the follow-up visit by Dr. Palmer's investigator, Mr. McCollum. The Center complains that this follow-up visit could have had nothing to do with official BOME business because Palmer had "closed" the Whaley investigation and the BOME has no jurisdiction over medical institutions, as opposed to practitioners.

55 L.Ed.2d 364. A plurality of the Supreme Court expressly approved the state action test that we set forth in *City of Lafayette*. *City of Lafayette v. Louisiana Power & Light Co.*, 1978, 98 S.Ct. 1123, 1137–38; *see also Bates v. State Bar of Arizona*, 1977, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810. Dr. Palmer therefore enjoys immunity to the extent that his conduct was within the scope of the authority granted to the director of the BOME by the Florida legislature. The scope of the agent's authority "may be demonstrated by explicit language in state statutes, or may be inferred from the nature of the powers and duties given to a particular government entity". *Duke & Co. v. Foerster*, 3 Cir. 1975, 521 F.2d 1277, 1280.

Dr. Palmer is Executive Director of the Florida Board of Medical Examiners. The Board's powers derive from Florida's Medical Practice Act. The general purpose of the Act is to protect the public against improper or unqualified practice of medicine and from professionally irresponsible conduct by persons licensed to practice medicine. Section 458.11 of the Florida Statutes authorizes the Board to aid law enforcement officials in the enforcement of the Act and the prosecution of persons charged with violating it. The Board is empowered in its discretion to issue administrative warning letters to licensed physicians for "apparent violations" of the Act, and to require the registration of unlicensed physicians practicing medicine where such practice is authorized. Section 458.1201(1) empowers the Board to discipline physicians for engaging in unethical, immoral, or unprofessional conduct or practice, for maintaining professional association with a person who is in violation of the Act or of the Board's regulations, for assisting the unlawful practice of medicine, or for being removed, suspended, or disciplined by his peers within a professional medical association or review organization. The nature of the disciplinary action authorized is set forth in section 458.1201(3)(a). The Board may deny a physician's license application, revoke, withhold, suspend, or restrict his license, or it may require him to submit to a variety of remedial or educational programs, and it may "[a]dminister a public or private reprimand."

We find nothing in the Medical Practice Act justifying summary judgment in Dr. Palmer's favor on the state action issue. The essence of the complaint against Palmer seems to be that, pursuant to a conspiracy, he used the prestige of his position to coerce Dr. Whaley into leaving the clinic. Aside from section 458.11(8)'s provision for administrative warning letters, the statute does not authorize the Board or its Director to use any sort of pressure or powers of persuasion to the end of causing a physician to cease and desist from engaging in practices that have never been adjudicated to be illegal or improper. Dr. Palmer's contention that the call was a private reprimand authorized by section 458.-1201(3)(a) 3 is without merit. That provision authorizes the Board to enter "an order" of reprimand whenever it "finds any person unqualified or guilty" of any violation of subsection (1). Dr. Palmer acted entirely on his own in this matter; there was no formal finding of guilt and no "order" was entered by the Board. Nor was Dr. Palmer's action the exercise of whatever residual disciplinary power, if any, may be granted by section 458.1201. That section gives *the Board* authority to discipline a physician who, "after hearing, has been adjudged unqualified or guilty" of the practices set forth therein. Finally, Palmer's telephone call to Dr. Whaley cannot be construed as a form of "administrative warning letter", which under section 458.11(8) the Director may issue, in his discretion, for "apparent violations" of the Act. On this point, Dr. Palmer stands impeached by his own characterization of the Whaley call. In his deposition, Palmer stated that he told Dr. Whaley that "[t]his is a personal call to you concerning your activities in Tallahassee". Although Palmer's characterization of the call does not estop him from now arguing that the call was official business, it is certainly strong evidence that it was not. Moreover, Dr. Palmer informed both Dr. Whaley and Dr. Mohammad that he'd

found no violations of the Act, either apparent or otherwise. This seems to us to defeat any contention that the call was an "administrative warning".[18]

Our ruling does not imply, however, that Dr. Palmer cannot in any eventuality avail himself of the state action defense. Our disposition of this appeal is dictated by the posture of the action. The theory of the plaintiff's case against Dr. Palmer is not yet entirely clear, and our duty is simply to determine whether there is any conceivable theory of the case under which Palmer would not be entitled to *Parker* immunity. We hold that there is. We conclude that summary judgment was improperly granted in favor of defendant Palmer on the Sherman Act issues.

## V

## THE STATE LAW CLAIMS

The Center's complaint in this action contained two state law counts that were also summarily adjudicated in favor of the defendants.

### A. *Interference with Contractual Relations.*

■■■ The Center complained that the defendant's actions amounted to tortious interference with the clinic's business relations with its physicians. Under Florida law the plaintiff is entitled to recovery upon showing (1) the existence of a business relationship (not necessarily one evidenced by an enforceable contract) under which the plaintiff has some legal rights; (2) the alleged tortfeasor's knowledge of the relationship; (3) the defendant's intentional interference with that relationship in a manner that is not legally justified or excused;

and (4) damage to the plaintiff. *John B. Reid and Assocs., Inc. v. Jiminez*, Fla.App. 1965, 181 So.2d 575; *Smith v. Ocean State Bank*, Fla.App.1976, 335 So.2d 641.

The district court granted summary judgment for the defendants on this issue. The court was of the opinion that, absent evidence that their conduct was "sham", the physicians' interference, if any, with the clinic's business relations would be justified by their statutory authority to report and investigate questions of medical ethics and professional responsibility. Judgment was granted because the court found the plaintiff's evidence of sham conduct to be insufficient.

■■■ The entry of summary judgment was erroneous. The district court's incorrect view that the core of the complaint goes to protected petitioning activity determined its approach to the plaintiff's tort count. We agree with the district court that petitioning activity is protected from state law liability as well as from federal antitrust liability. But, as we noted in Part III, much of the OB–GYNs' activity that the Center complains of is not protected petitioning activity. The doctors' complaint letter to the BOME cannot be made the basis of tort liability, but the other activity alleged is fair game. Whether the non-petitioning activity amounts to tortious interference with business relations must be determined at trial. Assuming, without deciding, that the defendants' alleged concern for the public welfare would constitute adequate justification or excuse under Florida law, triable issues nonetheless remain as to the genuineness of the defendants' concern, and also as to the scope of the justification. If, as the Center alleges, the doctors' activi-

18. We agree with Judge Thornberry's observation in his concurring opinion that Dr. Palmer is not foreclosed from demonstrating that his call to Dr. Whaley is comprehended by the authority granted him by the legislature. We hold only that the summary judgment granted in his favor cannot be sustained on the theory that the telephone call was an "administrative warning letter" within the meaning of section 458.11(8). We do not mean to imply that Dr. Palmer cannot ultimately show "from the na-

ture of the powers and duties" granted him, *see Duke & Co. v. Foerster*, 3 Cir. 1975, 521 F.2d 1277, 1280, that his call was a form of activity that may fairly be characterized as official action because integral to the process by which the Board or its Director discharges responsibilities expressly given them by the legislature. The telephone call could come within the *Parker* exemption in the absence of express statutory authorization for it.

ties went beyond mere persuasion and included threats, we do not think that the purity of their motivations would shield them from liability.[19]

■ Dr. Palmer contends that his actions are protected by Florida's doctrine of official immunity. As stated in *Schrank v. Bless*, 1976, M.D.Fla., 412 F.Supp. 28, 40, "[P]ublic executive officials, acting within their official capacity, are protected by a qualified immunity from liability, in the absence of demonstrated bad faith". Dr. Palmer is not entitled to summary judgment on the basis of this defense. Disputed fact issues remain as to whether Dr. Palmer's actions were within the scope of his official capacities, and, if so, whether he acted in good faith.

### B. The Florida Antitrust Statute.

The Center's complaint contained counts under the Florida antitrust statute, § 542.05 of the Florida statutes. That section, in broad outline, prohibits combinations formed for the purpose of restricting trade, fixing prices, or preventing competition in the provision of merchandise, produce, or commodities. The district court ruled that the Center's claim is barred by the holding of *Moles v. White*, Fla.App.1976, 336 So.2d 427, *cert. dismissed*, Fla.1978, 355 So.2d 516, that the statute does not reach the practice of medicine or the operation of hospitals. We affirm.

■ The *Moles* decision is the sole authority on the applicability of § 542.05 to the medical profession. The Florida Supreme Court has determined, in *Akey v. Murphy*, Fla.1970, 238 So.2d 94, that another part of chapter 542, specifically section 542.12, governs the conduct of physicians. But that court has yet to address the question decided in *Moles*. *Erie* does not, of course, require us to follow blindly the appeals court's decision in *Moles*. We may depart from the authority of an intermediate state appellate court decision if there is

"persuasive data that the highest court of the state would decide otherwise". *West v. American Telephone & Telegraph Co.*, 1940, 311 U.S. 223, 61 S.Ct. 179, 85 L.Ed. 139; *Shelp v. National Surety Corp.*, 5 Cir. 1964, 333 F.2d 431. We turn to the data.

The statute prohibits anticompetitive conduct on the part of "any person", and might therefore seem to be of general application. The statute reaches "restrictions in trade or commerce", and bans all manner of fixing prices for merchandise, produce, or "commodities", which the statute defines in § 542.01(2) to include "service or output of a service trade". The statute contains an express exemption for nonprofit agricultural cooperatives,[20] but none for hospitals or the medical profession.

■ Facial scrutiny, however, does not dispose of the question. Terms such as "commerce", "commodity", and "service" are so general that they tell us little about hard questions of exclusion or inclusion. Some effort must therefore be made to guess the intentions of the legislature that enacted the statute. Consideration of the statute's history suggests that it was not intended to reach the medical profession. Section 542.05 has its provenance in § 5, chapter 6933 of the Laws of Florida, Acts of 1915. The statute survives in nearly its original form, the only major change being the addition, in 1941, of the proviso excepting agricultural and horticultural cooperatives from the statute's prohibitions. The statute thus antedates by at least half a century the modern view that the learned professions are "business" or "commerce" just like any other for-profit endeavor. In light of the former popularity of the view that the learned professions were not "trade", and therefore not subject to the federal antitrust laws, *see Atlantic Cleaners and Dyers, Inc. v. United States*, 1932, 286 U.S. 427, 52 S.Ct. 607, 76 L.Ed. 1204, a view that persisted in some courts until the Su-

---

**19.** The issue of justification or excuse is a complex one that must be decided by weighing numerous factors. *See* Restatement of the Law of Torts, § 767 (1939).

**20.** Fla.Stats. § 542.05(5).

preme Court's *Goldfarb* decision,[21] it seems unlikely that the 1915 Florida legislature thought that its anticombination statute comprehended the medical profession.

The Florida Supreme Court's ruling in *Akey v. Murphy*, Fla.1970, 238 So.2d 94, does not support the appellant's case. The question in *Akey* was whether subsections (2) and (3) of § 542.12 apply to physicians. Those provisions remove certain kinds of noncompetition covenants from the scope of the general prohibition of such covenants contained in subsection (1) of § 542.12. The court in *Akey* reasoned that, because subsection (1) expressly applies to "professions", then subsections (2) and (3), which essentially modify subsection (1), also reach "professions"—including the medical profession. *Akey* does not hold or even imply that chapter 542 as a whole applies to the practice of medicine. The provision construed in that case was first enacted in 1953 and was, apparently, modeled upon similar statutes in other states. *Akey v. Murphy*, 238 So.2d at 96. Section 542.05 was enacted in 1915. It contains no reference to professions. That the Florida Supreme Court sees no conflict between the *Akey* and *Moles* decisions is suggested by its dismissal of the certiorari petition filed in *Moles* itself. Under Florida law a decision of an appellate court comes within the Supreme Court's constitutional certiorari jurisdiction if it conflicts with a decision of the Supreme Court or of an appeals court on the same point of law.[22] If *Akey* and *Moles* were irreconcilable the Florida Supreme Court would probably not have dismissed the certiorari petition as it did.

Because we are not convinced that the Florida Supreme Court would hold § 542.05 applicable to the medical profession, we are bound by the authority of the state appellate court's *Moles* decision. We therefore affirm the district court's ruling dismissing the state antitrust law claim.

## VI

## CONCLUSION

Triable issues of fact underlying the Center's Sherman Act and common law tort claims against all the defendants remain. The judgments in favor of the defendants are REVERSED, and the cause is remanded for trial.

AFFIRMED IN PART, REVERSED IN PART and REMANDED.

THORNBERRY, Circuit Judge, specially concurring:

As is his custom, Judge Wisdom has written an able opinion for the court. I fully concur in the result and without wishing to detract from his opinion, I wish to add a few thoughts of my own.

Dr. Palmer insists that his call to Dr. Whaley was a form of "administrative warning" contemplated by the Florida statutory scheme. The majority holds that at this juncture, summary judgment is improper on the *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) issue. With this determination, I agree. I wish, however, to write briefly to emphasize that our court has not held that Palmer has no *Parker v. Brown* exemption.

21. *See, e. g., Marjorie Webster Junior College, Inc. v. Middle States Ass'n of Colleges and Secondary Schools, Inc.,* 1970, 139 U.S.App. D.C. 217, 432 F.2d 650; *Greene v. Howard Univ.,* 1969, 134 U.S.App.D.C. 81, 412 F.2d 1128; *Riggall v. Washington County Medical Society,* 8 Cir. 1957, 249 F.2d 266.

22. Article V, § 3(b) of the Florida Constitution states:
　　　JURISDICTION.—The supreme court:
　　　*　*　*　*　*　*
　　(3) May review by certiorari any decision of a district court of appeal that affects a class of constitutional or state officers, that passes upon a question certified by a district court of appeal to be of great public interest, or that is in direct conflict with a decision of any district court of appeal or of the supreme court on the same question of law, and any interlocutory order passing upon a matter which upon final judgment would be directly appealable to the supreme court; and may issue writs of certiorari to commissions established by general law having statewide jurisdiction.

**554**

The majority notes that summary judgment is improper on the *Parker* issue because: (1) Dr. Palmer announced to Dr. Whaley that his call was "personal" in nature, and (2) Dr. Palmer informed both Dr. Whaley and Dr. Mohammad that he had found no violation at the Center. I have no doubt that in the face of these facts, there remains a triable issue as to Dr. Palmer's motive in making the call. I eschew, however, the majority's characterization that this evidence is "strong" that Dr. Palmer was not acting within the scope of his authority when he made the calls. I would not be surprised to find that as a first step, such informal communications almost always precede a formal communication and official adjudication. In *City of Lafayette v. La. Power & Light Co.*, 434 U.S. 811, 98 S.Ct. 1123, 1138, 55 L.Ed.2d 364 (1978), the Supreme Court said that the *Parker* exemption does not depend on the ability "to point to a specific, detailed legislative authorization." Similarly, I do not think it is a requirement of *Parker v. Brown* that the official claiming the exemption must wear the robe and carry the mace before the exemption applies.